In re Alan D. EMERSON and Brenda E. Emerson, Debtors.

Jeffrey A. Schreiber, Chapter 7 Trustee, Plaintiff,

v.

Alan D. Emerson and Brenda E. Emerson, Defendants.

Jeffrey A. Schreiber, Chapter 7 Trustee, Plaintiff,

v.

William H. Stephenson and John W. Stephenson, Defendants.

Bankruptcy No. 97–10318–JMD. Adversary Nos. 97–1095–JMD, 99–1006–JMD.

United States Bankruptcy Court, D. New Hampshire.

Oct. 26, 1999.

Randall L. Pratt, Law Offices of Steven Slovenski, Portsmouth, NH, for Jeffrey A. Schreiber, Chapter 7 Trustee.

Michael Burke, Law Office of Gregg M. Lewis, Laconia, NH, for Alan D. and Brenda E. Emerson.

John Rogers, Meredith, NH, for William H. and John W. Stephenson.

## *MEMORANDUM OPINION*

J. MICHAEL DEASY, Bankruptcy Judge.

## I. INTRODUCTION

Alan Emerson ("Emerson") and his wife Brenda Emerson (collectively the "Debtors") filed Chapter 7 bankruptcy on January 31, 1997. Jeffrey Schreiber, the Chapter 7 Trustee (the "Trustee"), brought suit against the Debtors in four counts seeking to deny the Debtors their discharge under 11 U.S.C. § 727 (Adv. No. 97–1095–JMD) (the "Emerson Complaint"). In Count I of the Emerson Complaint, the Trustee seeks to deny the Debtors' discharge under section 727(a)(2) for the Debtors' fraudulent transfer and concealment of assets. In Count II, the Trustee seeks to deny the Debtors' discharge under section 727(a)(3) for failure to keep adequate books and records. In Count III, the Trustee seeks to deny the Debtors' discharge under section 727(a)(4)(A) for making false statements in connection with their bankruptcy case. In Count IV, the Trustee seeks to deny the Debtors' discharge under section 727(a)(5) for the Debtors' failure to satisfactorily explain losses or insolvency.

The Trustee also brought suit against John Stephenson ("Stephenson") and his son William Stephenson (collectively the "Stephensons") seeking (1) to recover a 1978 Piper Seneca aircraft (the "Seneca") transferred by Robert Swain ("Swain") to William Stephenson; (2) to recover a Piper Warrior aircraft (the "Warrior") transferred by the Debtors to Stephenson; (3) to avoid a security interest in certain inventory, equipment, accounts, and general intangibles granted to Stephenson in September 1996; and (4) to avoid an identical security interest granted to William Stephenson in September 1996 (Adv. No. 99–1006) (the "Stephenson Complaint"). In Count I of the Stephenson Complaint, the Trustee seeks to avoid all four transfers pursuant to 11 U.S.C. § 547, the Bankruptcy Code's preferential transfer provision. In Count II, the Trustee seeks to avoid all four transfers pursuant to 11 U.S.C. § 548, one of the Bankruptcy Code's fraudulent transfer provisions. In Count III, the Trustee seeks to avoid all four transfers pursuant to 11 U.S.C. § 544 and RSA 545–A:4 and 5, New Hampshire's Uniform Fraudulent Transfer Act (the "UFTA").

On April 19, 1999, the Court denied the Stephensons' motion for summary judgment on all counts of the Stephenson Complaint. *See* Memorandum Opinion and Order dated April 19, 1999. The Trustee's two adversary proceedings were consolidated for trial. The Court conducted a three day trial of both matters in July 1999 and, after the parties finished presenting evidence, the Court took the matters un-

der advisement and requested that the parties submit written closing arguments.

In this opinion, the Court first sets forth the factual history and background common to both the Emerson Complaint and the Stephenson Complaint as established by the parties at trial. The Court then addresses each count of each complaint separately. The Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. FACTUAL HISTORY

### A. Relationship Between the Debtors and the Stephensons

The Debtors and the Stephensons have a long and complicated history of business dealings. During the 1960s and early 1970s, Emerson was employed by Winnipesauke Aviation, the only "fixed base operator" ("FBO") at Laconia Airport in New Hampshire. In the early 1970s, Emerson left Winnipesauke Aviation and began operating a landscape business with his sons. When Winnipesauke Aviation went out of business in 1976, Emerson started his own FBO business at the airport. Emerson began his business in a small hangar located at the airport on land owned by him and his wife adjacent to their home. Shortly after Emerson started the FBO operation, his wife Brenda Emerson began working in the business as office manager and treasurer. Brenda Emerson was fully involved in the office management and financial aspects of the business at all times relevant to these adversary proceedings. Emerson was involved in the maintenance, repair, appraisal, purchase, sale and chartering of airplanes as well as flight instruction.

Stephenson retired from an aerospace engineering position at Hughes Aircraft in California and moved to New Hampshire in 1975. When he arrived in New Hampshire, Stephenson owned four airplanes and needed a place to tie down (i.e., park) his airplanes and someone to service them. The closest airport to his new home was Laconia Airport, and Winnipesauke Aviation was the only business available at that airport to service his planes. When Winnipesauke Aviation went out of business shortly after Stephenson arrived in New Hampshire, Emerson agreed to provide Stephenson with free tie down space for his airplanes and to fuel and maintain them. Over time Stephenson and Emerson developed a cordial business relationship based upon their mutual interest in aviation in general and in Emerson's FBO operations at Laconia Airport in particular. As detailed below, as the relationship developed, Stephenson began loaning money to the Debtors to fund business operations and the construction of hangar facilities at the airport. In 1994, Stephenson's son, William Stephenson, purchased the second mortgage on the Debtors' home and hangar property. There was no evidence offered at trial, however, establishing a direct business or personal relationship between William Stephenson and the Debtors. Accordingly, it appears that William Stephenson's involvement with the Debtors resulted from his father's interest in the Debtors and their business.

### B. Loans for Business Operations and Facilities During 1978 to 1991

In 1978 the Debtors began building an office on the back of their hangar to service their growing aviation business. In late 1978, Stephenson either provided Emerson with building materials for the project or paid for such materials. The Debtors and others provided the labor for the project. On December 3, 1978, Stephenson and Emerson executed a document titled "Loan Agreement" (the "First Loan") which obligated Emerson (1) to pay Stephenson the sum of $2,928.93 "received in building materials" within one year with interest at the rate of five percent per year

on the unpaid balance; and (2) to provide tie down space and "normal protection to aircraft controlled by John Stephenson" until the loan was paid. Four years later, in February 1983, Stephenson made a notation on the First Loan loan agreement indicating that no payments had been made on the First Loan as of that date.

Subsequent to the First Loan, the Debtors' gasoline supplier notified them that credit terms were no longer available due to gas allocations and that their purchases could be made only on a COD basis. The Debtors, however, did not have the cash to purchase a load of aviation gasoline, approximately 8,000 gallons. Stephenson agreed to loan Emerson $6,300.00 for the purchase of gasoline due to his interest in the Debtors' business operations and in the availability of gasoline for his aircraft. In an undated addition to the loan document for the First Loan, Stephenson and Emerson signed an agreement (the "Second Loan") under which Emerson agreed (1) to repay the $6,300.00 loan in monthly installments equal to the cost of gasoline sold during the previous month; and (2) to sell gasoline to Stephenson at $0.09 over cost during the repayment period. In February 1983, Stephenson made a notation on the loan agreement for the First and Second Loans indicating that no payments had been made on the Second Loan as of that date.

In 1983 the Debtors and Stephenson discussed the need for hangar space at Laconia Airport. Stephenson wanted inside storage space for his aircraft, and Emerson wanted hangar space to rent to third parties as part of his FBO operations. As an engineer and long time pilot, Stephenson designed a hangar structure that would provide ten separate storage areas in one structure with easy access to each unit. The parties agreed that the Debtors would build the hangar and that Stephenson would finance the purchase of the materials. On February 25, 1983, Emerson and Stephenson executed a "Loan Agreement for Hangar 35" (the "Third

Loan"). Under the terms of the agreement Stephenson was to advance the funds needed for materials and any other costs, to which he agreed from time to time, for the construction of a ten unit hangar. In addition, the balances due on the First and Second Loans were to be combined with the money advanced for the new hangar resulting in one consolidated loan. Under the terms of the Third Loan, Emerson was to start making payments when the first rental income was received on the hangar space at a rate that would pay off the loan "by the end of 1989," a term of slightly less than six years, subject to the loan payments not exceeding fifty percent of the gross rental income rate for the hangars regardless of the payback rate or time limit. The agreement for the Third Loan expressly stated that the parties' objective was to insure the success of the Debtors' business while providing cost effective protection for Stephenson's aircraft. In addition, one of the ten units, the "north most hangar space," was to be available to Stephenson and his "family, heirs and assigns" for the storage of his aircraft. Pursuant to the agreement, Stephenson also had a right of first refusal to finance a second hangar unit on similar terms, which would include his ownership of one unit in the second hangar.

Stephenson prepared a loan schedule that reflected an advance under the Third Loan for materials for the hangar in the amount of $30,767.01 which, after a deduction of ten percent for the one unit "owned" by Stephenson, resulted in a new loan of $27,690.31. The Third Loan together with a balance of $13,340.28 due on the First and Second Loans resulted in a combined loan of $41,030.59 as of February 25, 1983.

Between 1983 and 1992, Stephenson's records show additional advances by him of approximately $10,000.00, credits through set-offs for aviation repair services and fuel purchases of approximately $10,000.00, and the accrual of interest, resulting in a balance of $99,966.00 owed by

Emerson to Stephenson in 1992. Stephenson's records do not reflect any debt service payments by the Debtors, other than set-offs by Stephenson for repairs and fuel provided by the Debtors from time to time. The Court notes that out of the approximately $10,000.00 of such set-offs, $7,181.49 was for an engine overhaul sometime in 1988. In 1987 and 1988, Stephenson advanced monies for a second hangar but the Debtors made little or no progress in its construction.

The Debtors testified that they relied on Stephenson's record of what they owed to Stephenson. The Debtors did not maintain any separate record of their own. Brenda Emerson testified that the only record she ever maintained on behalf of the business with respect to the Stephenson loans was to make notations on the payment schedule provided by Stephenson after 1992.

During the 1990 to 1992 period, the Debtors entered into a joint venture agreement with a third party to purchase for $5.00 a hangar at the Manchester, New Hampshire airport, dismantle it, and move it to the Debtor's facility at Laconia Airport. Stephenson had no interest in this new hangar initially, but as site work and erection of this hangar began, he became concerned over the impact of its location on access to his unit in Emerson's existing hangar.

## C. The 1992 Agreement Between Emerson and Stephenson

Stephenson testified that, despite Emerson's history of not servicing the loans that he made, he viewed the Emerson loans as an "investment" on which he stood to get a better return than at a bank. Stephenson also testified that his dealings with the Debtors insured that an FBO and hangar facilities would be available for his use at Laconia Airport.

On November 27, 1992 the Debtors and Stephenson entered into a "Construction, Ownership, Rental & Lease Agreement" (the "Fourth Loan"). Under the terms of the Fourth Loan, Stephenson agreed to advance $53,000.00 of new money to the Debtors to be used by them to "obtain clear title" to the new hangar from their partner and to complete its construction. The $53,000.00 advance was to be added to the $99,966.00 balance then due under the Third Loan, resulting in a consolidated obligation from the Debtors to Stephenson in the total amount of $152,966.00.

The agreement executed in connection with the Fourth Loan is confusing and contradictory. The agreement begins by reciting that Stephenson owned two hangar spaces in the hangar built under the 1983 agreement (not the one unit or ten percent reflected in the loan calculations) plus a fraction of the remainder of the 1983 hangar and the new hangar equal to his investment. At the inception of the Fourth Loan the fraction of Stephenson's "ownership" was deemed to be one hundred percent, but under the terms of the agreement that fraction could increase to more than one hundred percent if further advances by Stephenson were to exceed reductions in the amount owed through payments by the Debtors. Stephenson referred to this agreement as a "lease purchase" agreement. Apparently, pursuant to the agreement, the parties envisioned that Stephenson would take ownership of certain assets and lease them to the Debtors. Although such a result may have been intended by the parties, no documents or deeds were executed, delivered, or recorded to effectuate any transfer of ownership.

The agreement further provided that the Debtors would purchase Stephenson's interest in the hangars by making payments in the amount of the Fourth Loan in equal monthly installments over twenty years. During the term of the so-called "lease purchase" the Debtors were to pay monthly "rent" equal to 1/12th of the rent rate on the unpaid portion of the purchase price. The rent rate was to be determined at the beginning of each year and was

equal to "the last published prime lending rate plus 2.5 percent." The Debtors were also required to manage and maintain the hangars and to provide general liability coverage in a minimum amount naming the Debtors and Stephenson as insureds. Interestingly, the agreement provided that loss of all or part of the hangars from any cause would not discharge the liability of the Debtors to make payments whether or not the hangars were repaired or restored. Finally, as additional protection for Stephenson, the agreement required that a third mortgage be executed on the property to secure the Debtors' obligations. Accordingly, a mortgage on the Debtors' land and buildings in favor of Stephenson was executed on November 27, 1992 and recorded in the Belknap County Registry of Deeds. Stephenson testified that he received regular payments under the Fourth Loan agreement for the first twenty-six months from January 1993 through February 1995 and that payments ceased altogether in April 1995.

### D. The Keene Airport/Warrior Transaction (1993 to 1996)

On June 1, 1993 Stephenson loaned Emerson $30,000.00 to be used to purchase a then lucrative FBO operation at Keene Airport in Swanzey, New Hampshire. Emerson and Stephenson executed a written memorandum of the loan, which provided for a term of eleven years with interest at an initial fixed rate of twelve percent and a reduction to the prime rate plus four percent once monthly payments of $800.00 or more were made (the "Fifth Loan"). The memorandum provided no method of determining the amount or frequency of any periodic payments. The memorandum also provided that the loan was "to be secured with Bill of Sale lien on Piper Warrior N32560 serial # 28–7515187."[1] Contemporaneously with the execution of the memorandum agreement on the Fifth Loan, Emerson executed and

delivered a bill of sale for the Warrior to Stephenson. The parties testified that only one payment in the amount of $500.00 was ever made on the Fifth Loan.

Shortly after Emerson's purchase of the FBO operation at Keene Airport, the only regularly scheduled airline servicing Keene Airport ceased operations. With the loss of the fuel purchases by that airline, the Debtors' Keene operation could not support itself. Emerson testified that in March 1995 he told Stephenson that he could not repay the Fifth Loan and that Stephenson should take the airplane. Stephenson, however, took no action for over a year. Ultimately the parties determined that, as a registered owner, Brenda Emerson needed to sign the bill of sale in order to transfer the Warrior. On September 5, 1996, the Debtors signed a revised bill of sale in favor of Stephenson. The new bill of sale was recorded with the FAA on October 21, 1996. Stephenson never sent the Debtors any notice of a public or private sale of the Warrior nor any notice of his intent to retain the plane in satisfaction of the Fifth Loan.

### E. The Seneca (1988 to 1996)

In 1988 and 1989, Emerson provided approximately $36,000.00 worth of improvements, maintenance, repairs, and parts for the Seneca owned by Swain. A portion of the work and the parts was to repair damage from a "gear up" landing by Swain and was paid by insurance. By early 1990, Swain still owed Emerson approximately $26,000.00 for his work. Although Swain used the Seneca from time to time, Emerson maintained primary possession and claimed a mechanic's lien for the work he completed in 1988 and 1989. By late 1990, Swain was behind in making payments to Emerson and notified Emerson that he could no longer afford to pay Emerson or to continue his loan payments

---

1. This memorandum was signed only by Emerson even though ownership of the Warrior was registered with the FAA in the names of both Alan Emerson and Brenda Emerson. The bill of sale delivered to Stephenson in 1993 was also signed only by Alan Emerson.

to Shawmut Bank (the "Bank"), the holder of a note secured by the airplane. In fact, Swain was contemplating bankruptcy.

As a result of some discussions between Swain and Emerson, the parties agreed that Emerson would keep the Seneca and, if he would pay the monthly loan payments of approximately $675.00 per month to the Bank, Emerson could attempt to sell the plane and apply any proceeds in excess of the payoff on the Bank's loan to the amounts Swain owed to him. The parties also apparently agreed that if Emerson kept the Seneca and paid the Bank's loan in full, Emerson would own the airplane. The Bank's agent, Mel Dorr, advised Swain that the Bank would not seek to repossess the Seneca if the loan payments were made and if Swain executed a bill of sale in favor of Emerson to protect Emerson for the payments he would be making on Swain's loan. Swain and Emerson agreed with those conditions. Swain delivered a bill of sale dated December 14, 1990 in favor of Emerson to Dorr to hold in escrow. At the time Swain delivered the bill of sale, the Bank was owed more than $40,000.00.

Emerson advertised the Seneca for sale and showed the plane to a number of interested purchasers. He did not receive any offers sufficient to pay the Bank's loan in full. In 1991 Emerson obtained the Bank's consent to fly the Seneca to Florida to attempt to sell it at a large airplane auction. The best bid Emerson received at the auction was only $40,000.00, not enough to pay the loan in full or to leave any proceeds to be applied to Swain's debt to Emerson. According to Emerson, the fact that the Seneca had two "gear up" landings significantly depressed its value.

After his lack of success in selling the Seneca, Emerson ceased active marketing efforts. He brought the Seneca back to Laconia Airport and proceeded to "lease" it to third parties in order to generate sufficient revenue to cover the monthly payments to the Bank as well as maintenance and insurance expenses. FAA regu-lations require a person operating an air-plane to have a written lease agreement with the registered owner. Accordingly, Swain executed a one page lease agree-ment with Emerson that did not set any rental rate. Pursuant to their agreement, Emerson was required to insure the air-plane, to pay all operating expenses, and to make installment payments on the Bank's loan. In 1993 Swain executed two written lease agreements with Charter Me, Inc., a third party flight operation located in Maine, as the "lessee" and Emerson as the "co-lessee." Under the terms of these two leases, the lessee was responsible for ex-penses and insurance. Emerson, as co-lessee, had rights of first refusal to use the airplane and to perform all repairs, as well as a right to approve the use of the air-craft by anyone other than the lessee's employees. All lease payments were made either to Emerson or to the lessee, with an accounting to Emerson, and Emerson paid the Bank directly. The parties did not present any evidence at trial that Emerson ever provided Swain with an accounting of lease operations or monies received or that Swain ever participated in the leasing of the Seneca, other than by signing the re-quired written leases.

At trial the Debtors testified that they were unsure whether they would own the Seneca if they paid the Bank's loan in full. They stated, however, that they were enti-tled to the amount Swain owed them on account of their mechanic's lien in addition to reimbursement for any loan payments they made to the Bank. The Debtors testi-fied that they did not know exactly how much they paid the Bank on the Seneca. It appears, however, that the balance due on the loan was at least $40,000.00 when they entered into their agreement with Swain and that Stephenson's son paid $6,070.08 to the Bank in May 1996 in full satisfaction of the loan. Thus, the Debt-ors' "investment" in the Seneca totaled at least $59,929.92, which includes the $33,-929.92 in principal they must have paid on the Swain loan, an unknown amount of

interest, and the original unpaid service bills of approximately $26,000.00.

Charter Me, Inc. ceased using the Seneca in December 1994 or January 1995. In September 1995, Emerson's counsel advised him that the FAA considered the Seneca illegally registered to Swain and used by Emerson and informed Emerson that the Seneca was subject to seizure by the government if Emerson continued leasing the airplane. Thus, Emerson could not use the plane to conduct charters nor could he let others lease the airplane due to the registration claims by the FAA. Between January 1995 and May 1996, the engine hour meter of the Seneca reflected only seven hours of use. Because Emerson was unable to generate revenue from the operation of the Seneca, his payments to the Bank essentially ceased and in December 1995 the Bank's agent told Emerson that the Bank would be forced to repossess and sell the Seneca to pay an approximate $6,000.00 balance then due on its loan to Swain. Notwithstanding the then substantial payment default, the Bank elected to leave the Seneca in Emerson's possession subject to his agreement to keep insurance on the airplane hull and not to fly the plane. The parties presented no evidence at trial that during this time Swain ever contacted the Debtors regarding the status of the Seneca or that the Debtors ever notified Swain of their problems leasing the Seneca or paying the Bank's loan.

In April or May 1996 Emerson and Stephenson discussed the status of the Seneca and the arrangement that Emerson had with Swain and the Bank. Emerson told Stephenson that he had a person who would lease the airplane, but that he was unable to lease it as Emerson did not own it and did not have the money to payoff the Bank's loan. It is not clear how much Emerson told Stephenson about his long term financial involvement with Swain and the Seneca, but given Stephenson's long standing financial relationship with Emerson, their mutual interest in aviation, and

Stephenson's testimony that he had assisted Emerson in FAA litigation, which involved Emerson's use of the Seneca, Stephenson must have had some knowledge of the arrangement between Swain and Emerson regarding the plane.

In June 1996, Swain issued a new bill of sale in favor of Stephenson's son, William Stephenson. Emerson denies that he took any part in the transfer of the Seneca to William Stephenson. Stephenson testified that he directly contacted the Bank's agent and either directly or indirectly through the Bank's agent made arrangements to acquire the Seneca by paying the $6,070.08 balance owed on the loan in order to discharge Swain's obligation to the Bank. Swain executed a bill of sale on June 14, 1996 in favor of William Stephenson, which was recorded with the FAA on August 6, 1996. Emerson's equitable interest in the Seneca, acquired through his unrecorded agreement with Swain, was not discharged as a result of the payoff of the Bank's loan or .the transfer to William Stephenson. Emerson testified that he hoped to reach an agreement about receiving a credit against his obligation to William Stephenson on the second mortgage on the Debtors' home and hangars if the Seneca later was sold and turned out to be worth more than the payoff to the Bank. However, Emerson never obtained any such agreement from the Stephensons and did not push either Stephenson or his son on the point.

## F. FAA Enforcement Actions from 1990 to 1997 against Emerson

In the early 1990s, Emerson became the subject of a series of FAA enforcement actions. On November 2, 1990 his airman certificate was suspended for ninety days for entering restricted airspace near Pittsburgh, Pennsylvania. On August 9, 1991, the FAA revoked his flight instructor certificate for making false endorsements in student flight records. Both of these enforcement actions were upheld on appeal by the National Transportation Safety Bu-

reau. On March 9, 1992, Emerson Aviation's air taxi certificate was retroactively suspended for 365 days for numerous violations of federal aviation regulations. *See United States v. Emerson*, 927 F.Supp. 23, 26 (D.N.H.1996).

On May 12, 1992 the FAA issued an emergency order revoking Emerson's airman certificate. This action prevented Emerson from carrying persons or property in air commerce for compensation or hire. In 1994 the United States filed suit against Emerson to recover a civil penalty of $320,000.00 for past violations of federal aviation law and to permanently enjoin future violations. *See United States v. Emerson*, 1995 WL 136910 (D.N.H.1995). The FAA alleged that on twenty-three separate occasions from November 11, 1992 to July 28, 1993 Emerson operated or permitted others to operate two airplanes, one of which was the Seneca, on round trip passenger flights for compensation from Laconia Airport. The FAA also alleged that Emerson advertised, or otherwise offered to perform, charter flight operations for which he failed to possess proper certification. On April 24, 1996 the District Court entered judgment against Emerson, individually, and d/b/a Emerson Aviation on thirty-seven separate violations, and assessed a civil penalty in the amount of $185,000.00. The District Court also issued a permanent injunction against future violations of federal aviation laws. *See Emerson*, 927 F.Supp. at 29. In September 1996 the government recorded an Abstract of Judgment in Florida and New Hampshire in order to perfect a lien on Emerson's real estate under 28 U.S.C. § 3201. Emerson appealed the amount of the civil penalty. The First Circuit Court of Appeals upheld the original assessment. *See United States v. Emerson*, 107 F.3d 77 (1st Cir.), *cert. denied*, 522 U.S. 814, 118 S.Ct. 61, 139 L.Ed.2d 24 (1997).

## G. The Year Preceding Bankruptcy (1996)

By 1996 the Debtors' financial and business affairs were in extremis. The Debt-

ors were piloting their financial airplane with only the fuel in their reserve tank, on a moonless night, with developing ground fog, and without an instrument rating. While the Debtors occasionally checked with their accountant in the control tower, he was having little success talking them into a safe landing. The Debtors were conserving fuel by not servicing their obligations to the Stephensons and others. The Debtors needed to find a way to make a financial landing from which they could walk away.

The Debtors testified that the IRS was levying bank accounts from time to time and threatening to seize the business and its assets. Emerson's ability to earn a living in aviation was substantially impaired by the revocation of his airman certificate and flight instructor certificate. As described above, in April 1996 the District Court entered a judgment against him and imposed a $185,000.00 civil penalty. The holder of the first mortgage on the Debtors' airplane hangars was threatening to foreclose, which would affect the continued operation of their business. The Debtors had not made any payments to William Stephenson since he purchased the note from AMRESCO in March 1994 or to Stephenson since April 1995, and the Stephensons were talking with a lawyer about the status of the Debtors' obligations to them. Although Emerson had managed to keep possession of the Seneca through William Stephenson's payoff of the Bank's loan, he had no firm agreement about getting credit for his investment in the Seneca or any plan for selling the Seneca to generate sufficient value from which he might receive such a credit.

In September 1996, the Debtors, the Stephensons, their respective counsel, and the Debtor's accountant met to discuss the Debtors' financial situation. Although the Debtors and Stephenson had conducted their business relations over an eighteen year period from 1978 to 1996 without consulting lawyers, they now felt it was

necessary, for the first time in the history of their relationship, to meet with their respective legal counsel to discuss a way to land the Debtors' financial airplane without unreasonable injury to the Debtors or persons on the ground (i.e., the Stephensons).

At the September 1996 meeting the Debtors and the Stephensons agreed to the following:

1. The Debtors' existing business entity, Emerson Aviation Inc.,[2] would be dissolved and a new corporation would be formed.

2. The new corporation would have a name similar to the prior corporation so that third parties would believe that Emerson was still running the FBO.[3]

3. Stephenson and William Stephenson would "take possession" of all of the Debtors' assets and business operations although the Debtors would continue to operate their business.

4. The Debtors would post signs in the buildings located on the Debtors' real estate at Laconia Airport indicating that the business was under new ownership but no sign would be posted at the FBO office leased from the Laconia Airport Authority.

5. Stephenson or William Stephenson would buy the note held by the first mortgage on the Debtors' hangars.

6. The financial terms for the Debtors' continued operation of the FBO business would be settled later.

The Debtors testified that shortly after this meeting they set up the new corporation without the assistance of their lawyer. Whether by intent or inadvertence, neither the Debtors nor their attorney drafted any documents transferring legal title or any leasehold interest in the business assets to the new corporation.[4] The Debtors testified that all business income was paid into and all business expenses were paid from the new corporation.

On September 16, 1996, UCC financing statements from "Emerson Aviation, Alan Emerson d/b/a Emerson Aviation" and "Alan Emerson" as debtors were recorded in favor of Stephenson and William Stephenson as secured parties in Belknap County Registry of Deeds. The financing statements recite:

> The Security Agreement is granted in the following collateral: a. All machinery, equipment, furniture, fixtures, and other goods ... whether now owned or hereafter acquired by the Debtor ... b. All inventory of the Debtor including ... property held for sale or lease ... c. All accounts, contract rights and accounts receivable, all ... choses in action ... d. All general intangibles ... including any trade name or names used by the Debtor, all leases and rents, books and records, customer lists, computer programs, tapes and related data processing software.

There was no evidence offered at trial that Brenda Emerson or either of the Debtors' corporations executed UCC financing statements in favor of Stephenson and his son even though the Debtors' business activities had been conducted through corporations since early 1994 and Brenda Emerson was the sole shareholder and president of those corporations. Further, it appears that the UCC financing statements signed by Emerson were not filed with the Gilford

---

2. Brenda Emerson was the president and sole shareholder of Emerson Aviation, Inc., a corporation formed in March 1994 to operate the business formerly operated by Alan Emerson as a proprietorship under the name Emerson Aviation.

3. Alan Emerson Aviation, Inc. was formed in September 1996 with Brenda Emerson as president and sole shareholder.

4. The Debtors testified that they had formed Emerson Aviation, Inc. in the same manner in 1994 and that no formal documentation had been signed transferring any assets or leasehold interests to that corporation.

Town Clerk or the Secretary of State as required by RSA 382–A:9–401(1)(c). In addition, there is no evidence that either of the Debtors signed a separate security agreement in favor of the Stephensons.

Stephenson testified that the UCC financing statements were additional security to cover unpaid interest payments on the Debtors' obligations to him and his son and that even after they received the additional security Stephenson felt that he was undersecured. On September 19, 1996, Stephenson and his son also acquired the first mortgage note on the Debtors' hangars from Laconia Savings Bank. As discussed above, William Stephenson had acquired the second mortgage note from AMERSCO in 1994 and, as a result of the 1992 lease purchase agreement, Stephenson held a third mortgage on the Debtors' real estate.

Despite the Stephensons' interest in the Debtors' assets, the Stephensons never took actual possession of any of them. The parties presented no evidence that the Stephensons ever took any action or issued any document through which they claimed constructive possession of the Debtors' assets. Brenda Emerson testified that after the September 1996 meeting she understood that Stephenson and his son simply "owned" their assets because he had taken "possession or foreclosed" their mortgages and security interests. She testified that she believed that the Debtors would come to some agreement with Stephenson on how "things would work going forward." In response to a question from the Trustee's counsel, Brenda Emerson stated that after the September 1996 meeting the Debtors ran the property for the Stephensons' benefit. However, she also testified that no rental or mortgage payments had been made either to Stephenson or to his son since September 1996 because the Debtors could not make payments to "favored creditors."

In October 1996, the Debtors spoke with a new accountant in an attempt to find someone who could resolve their ongoing IRS problems. The new accountant advised the Debtors to consider bankruptcy. When their legal counsel flatly refused to assist the debtors in a bankruptcy filing, the new accountant referred them to a local bankruptcy practitioner with whom the accountant had previously worked. The new accountant was able to obtain some limited additional time from the IRS in order to resolve their tax difficulties, but the accountant testified that it was clear to him that the Debtors' were hopelessly insolvent and unable to reorganize their business. Their financial airplane had already crash landed and bankruptcy was their only option.

## H. The Debtors' Bankruptcy Filing

On January 31, 1997 the Debtors filed a skeletal petition under Chapter 7 of the Bankruptcy Code. On the evening of March 3, 1997, less than twenty-four hours before the Debtors' first meeting of creditors, the Debtors signed their schedules and statement of financial affairs after little or no review of their contents. These documents were filed with the Court the following morning on March 4, 1997 immediately before the first meeting of creditors.

The Debtors testified that they had spoken with their new accountant and their bankruptcy lawyer on a couple of occasions prior to the first meeting of creditors. Brenda Emerson testified that neither their accountant nor their lawyer requested any documents for use in preparing the Debtors' schedules and statement of financial affairs. She testified that she did not give any documents to either of them but rather she understood that they received the necessary documents from the Debtors' former accountant.

Schedule A listed the Debtors as owners of land and buildings consisting of their home and three hangars, which they valued at $392,100.00. Schedule B listed the Debtors as owners of a hangar on leased

land, which they valued at $61,900.00.[5] These assets total $454,000.00. Schedule D listed the three mortgages held by Stephenson and his son in the total amount of $336,248.00, real estate tax liens in favor of the Town of Gilford in the amount of $33,738.00, IRS tax liens on real estate in the total amount of $66,065.00, an attachment in the amount of $4,500.00, and a judgment lien in favor of the United States in the amount of $185,000.00. These liabilities total $625,551.00. Schedule B listed jointly owned business assets consisting of airplanes and accessories in the amount of $47,000.00, computer and office equipment in the amount of $910.00, inventory in the amount of $388.00, and machinery, equipment, and supplies in the amount of $4,070.00. This business related personal property totals $52,368.00. In Schedule C the Debtors claimed exemptions for all the business assets listed in Schedule B. Schedule G listed six leases involving the Debtors' business including two land leases with the Laconia Airport Authority, two fuel truck leases, a pickup truck lease, and a credit card machine lease. The Debtors did not list on Schedule G any of the transactions with the Stephensons, including the 1992 lease purchase agreement, the operation of the business after the Stephensons' "repossession," or the Debtors' continued use of the Warrior. Schedule I listed monthly gross income from Alan Emerson Aviation, Inc. of $1,200.00 per month for each of the Debtors.

In the answer to Question 4.b in the statement of financial affairs, the Debtors listed the following liens, attachments, or seizures within the year preceding bankruptcy:

| Creditor | Date of Seizure/lien | Description & Value |
|---|---|---|
| United States of America | 09/05/96 | judgment lien on real estate in the amount of $185,000 |
| Internal Revenue Service | 09/09/96 | federal tax lien in the amount of $20,000 |
| Jack Stephenson | 09/16/96 | security interest (UCC filing) in the amount of $152,966 |
| William Stephenson | 09/16/96 | security interest (UCC filing) in the amount of $152,966 |
| Jack & William Stephenson | 09/17/96 | Jack & William Stephenson took possession of all real and personal property of the Debtors covered under their respective mortgages and security agreements |

In response to Question 10, which required the Debtors to list transfers outside the ordinary course of business within the year preceding the commencement of the case, the Debtors responded "none." In response to Question 16.a, which required the Debtors to list businesses in which the Debtors were involved in an ownership or management capacity, the Debtors listed Brenda Emerson as president and sole shareholder of Emerson Aviation, Inc. from March 1994 through August 1996, Brenda Emerson as president and sole shareholder of Alan Emerson Aviation, Inc. from September 1996 to the petition date, and Emerson as proprietor of Emerson Airport Ground Support[6] from September 1996 to the petition date.

## III. Emerson Complaint

For the reasons outlined below, the Court denies the Trustee's claims under

5. This entry should have been listed on Schedule A because under New Hampshire law a building located on land of another is treated as real estate for purposes of transfers, mortgages, or leases and is subject to liens, foreclosure, and execution in the same manner as real estate. *See* RSA 477:44(I).

6. The parties offered no testimony at trial regarding this proprietorship.

sections 727(a)(2), (a)(3), and (a)(5) in Counts I, II, and IV of the Emerson Complaint. The Court grants in part and denies in part the Trustee's claims under section (a)(4)(A) in Count III.

### A. Count I: Denial of Discharge under 11 U.S.C. § 727(a)(2)

■ The Trustee alleges that the Debtors should be denied a discharge under section 727(a)(2) of the Bankruptcy Code because they transferred or concealed property within one year before the filing of their bankruptcy petition with an actual intent to hinder, delay, or defraud their creditors and the Trustee. In order to prevail under section 727(a)(2), the Trustee must establish that:

1. Within one year before the filing of the petition;

2. The Debtors or a duly authorized agent of the Debtors;

3. Transferred, removed, destroyed, or concealed any of the Debtors' property, or permitted any of these acts to be done;

4. With actual intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code.

*See In re Hayes,* 229 B.R. 253, 259 (1st Cir. BAP 1999).

■ "The statutory requirements for a discharge are 'construed liberally in favor of the debtor' and '[t]he reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural.'" *Palmacci v. Umpierrez,* 121 F.3d 781, 786 (1st Cir.1997) (quoting *Boroff v. Tully (In re Tully),* 818 F.2d 106, 110 (1st Cir.1987)). A debtor is entitled to a starting presumption that most debtors are honest and do not ordinarily engage in fraudulent activities. *See Francis v. Riso (In re Riso),* 74 B.R. 750, 756 (Bankr.D.N.H.1987). The purpose of certain sections of the Bankruptcy Code, such as section 727(a)(2), is to make certain that

those who seek the shelter of the Bankruptcy Code do not play fast and loose with their assets or with the reality of their affairs. *See Palmacci,* 121 F.3d at 786 (citing *Tully,* 818 F.2d at 110). When seeking denial of a debtor's discharge under section 727, the plaintiff has the burden of proof and must establish each element by a preponderance of the evidence. *See Hayes,* 229 B.R. at 259 (citing *Gillickson v. Brown (In re Brown),* 108 F.3d 1290, 1293 (10th Cir.1997)); *Lansdowne v. Cox (In re Cox),* 41 F.3d 1294, 1297 (9th Cir.1994); *Barclays/American Business Credit, Inc. v. Adams (In re Adams),* 31 F.3d 389, 393–94 & n. 1 (6th Cir.1994); *Montey Corp. v. Maletta (In re Maletta),* 159 B.R. 108 (Bankr.D.Conn.1993); *Grogan v. Garner,* 498 U.S. 279, 289–91, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (concluding that the appropriate standard of proof for section 523(a) actions is by a preponderance of the evidence and suggesting that it is the same under section 727); *Riso,* 74 B.R. at 756; Fed. R. Bankr.P. 4005.

The Trustee specifically alleges that the Debtors within one year of the filing of their bankruptcy petition, with actual intent to hinder, delay, or defraud their creditors and the Trustee:

1. Transferred, and concealed from the Trustee the terms of the transfer of, the Seneca to William Stephenson;

2. Transferred, and concealed from the Trustee the terms of the transfer of, the Warrior to Stephenson;

3. Concealed from the Trustee the lease income from the Debtors' hangars; and

4. Concealed the status of the possession of their assets by the Stephensons.

For the reasons discussed below, the Court finds that the Trustee has not met his burden of proof with respect to his allegations in Count I of the Emerson

Complaint.[7] Each of the Trustee's allegations, the Debtors' responses, and the Court's findings are analyzed and discussed in detail below.

### 1. The Seneca

The Trustee alleges that the Debtors had an interest in the Seneca prior to the commencement of the case and that the Debtors arranged for the transfer of the Seneca to Stephenson's son in June 1996, about eight months before the filing of their bankruptcy petition. The Trustee further alleges that the Debtors failed to disclose the transfer in their bankruptcy petition or statement of financial affairs. The Debtors contend that the Seneca was transferred by Swain, its record owner, and not by them, that they did not arrange for Swain's transfer of the Seneca, and that at the time of the transfer they had no property interest or rights in the Seneca.

■ Although the Debtors contend that they did not have any interest in the Seneca at the time of the transfer in 1996, the history of their relationship and dealings with Swain demonstrates that the Debtors bargained for and had an interest in the airplane. In 1990, Swain was unable to pay Emerson for the repairs Emerson made to the Seneca and was unable to continue to pay the Bank on a note secured by the airplane. In order to attempt to satisfy those obligations Swain gave possession and control of the airplane to Emerson and, at the Bank's insistence, delivered an executed bill of sale in favor of Emerson to the Bank's agent to hold in escrow pending payment of the Bank's loan.

It is not clear what the parties intended by their actions in 1990 (i.e., whether they intended to sell the Seneca to Emerson with the bill of sale to be recorded when the Bank's loan was paid in full or whether they intended to create a security interest in favor of Emerson for the amounts Swain owed to Emerson for repairs). What is clear is that after 1990 Swain, Emerson, and the Bank's agent treated Emerson as having the right to possess and control the Seneca, subject only to the Bank's security interest. *See Mileasing Co. v. Allavena (In re Allavena)*, 18 B.R. 527, 529 (Bankr. E.D.Pa.1982) (suggesting debtor's possession of truck was sufficient to constitute property of the debtor or the estate).

During the next four years, Swain cooperated with Emerson and signed several short open-ended lease agreements, solely for the purpose of attempting to comply with FAA regulations. The effect of these lease agreements was to provide a legal basis for Emerson to lease the Seneca and use the lease income to pay the Bank debt and maintain the airplane. *See id.* (suggesting debtor's leasehold interest in truck was sufficient to constitute property of the debtor or the estate). At no time after 1990 did Swain exercise, or attempt to exercise, any possession or control over the Seneca. Emerson had the right to control the leasing of the airplane and he bore the risk that the lease income would be insufficient to pay the Bank's loan, insurance, and maintenance costs of the Seneca. When the lease income exceeded the costs of operating the airplane, Emerson had no obligation to account to Swain for any such excess lease income. In effect, as a result of the 1990 transaction, Emerson had virtually all of the benefits of ownership and maintained the opportunity to recover the $26,000.00 that Swain owed him for repairs to the Seneca. Even though Emerson's interest in the Seneca was not perfected by recording with the FAA, *see* 49 U.S.C. § 44108(a), Swain and the Bank had actual knowledge of his in-

---

7. The Court notes, without deciding, that concealment of transfers may not come within the rubric of section 727(a)(2) because that section appears to deal only with concealment of property, not concealment of the transfer of property. *See* 11 U.S.C. § 727(a)(2); *Hayes,* 229 B.R. at 261 n. 11. The Trustee's allegations regarding concealment of the transfers is dealt with in the context of the Trustee's claims under section 727(a)(4)(A) in Count III of the Emerson Complaint.

terest or rights in the airplane. Accordingly, the Court finds that Emerson had an interest in the Seneca at the time it was transferred.[8]

■ The Debtors' defense that they did not actually make the transfer of the Seneca to William Stephenson, while factually correct, is not by itself a complete defense. The concept of a "transfer" under the Bankruptcy Code is very broad and includes "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. § 101(54). Under section 727(a)(2) the Debtors may be denied a discharge if they transferred property or *permitted a transfer to occur. See* 11 U.S.C. § 727(a)(2). The evidence at trial established that, even if Emerson did not directly "arrange" for the transfer of the Seneca, he at least gave Stephenson information on the pending repossession of the airplane by the Bank, the amount owed on the note, and the name and telephone number of the Bank's agent. In addition, Emerson did nothing to interfere with the transfer to William Stephenson or to insure that his interest was protected after the transfer. Accordingly, the Court finds that Emerson indirectly permitted the transfer to occur.

■ The Trustee alleges that Emerson acted with fraudulent intent when he assisted or permitted Stephenson to acquire the plane for his son for the amount owed to the Bank. In making its determination as to what Emerson actually believed and intended when he permitted the Seneca to be transferred, the Court is not bound by self-serving testimony of the Debtors. *See Riso,* 74 B.R. at 757. Rather, the Court can test the Debtors' asserted beliefs against the appropriate inferences to be drawn from all the surrounding objective factual circumstances. *See id.; Commerce Bank & Trust Co. v. Burgess (In re Burgess),* 955 F.2d 134, 137 (1st Cir.1992) (stating that any determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor). The Debtors testified that at the time of the transfer they did not have the cash to service the Bank's debt on a monthly basis and were unable to pay the balance of the loan in full. In addition, Emerson testified that he had attempted unsuccessfully on many occasions to sell the Seneca for more than the balance on the Bank's loan. While Stephenson testified that he had an appraisal indicating that the airplane might be worth $55,000.00, Emerson testified that the best offer he had ever obtained for the Seneca was $40,000.00. That offer was six years, and many engine hours, before the transfer to William Stephenson. Despite suggestions by the Trustee that the plane's engine and parts were worth more than the $6,000.00 owed to the Bank, the Trustee ignores the fact that Emerson could not strip the Seneca of its engines and other saleable components without first having sufficient cash to pay off the Bank's loan. The Trustee failed to establish that the Debtors' interest in the Seneca had any value.

At the time of the transfer of the Seneca to William Stephenson, the Debtors were in severe financial distress. They were not contemplating bankruptcy however. The Debtors were attempting to save their business operations, their home, and their livelihoods. The Debtors believed that they would lose the Seneca without recovering any equity in the airplane if the Bank foreclosed. The evidence established that Emerson thought that the acquisition of the Seneca by Stephenson, or

8. While repossession by the Bank might have extinguished Emerson's rights, if the Bank had sold the airplane for more than it was owed, Emerson may have had an equitable if not a legal claim to any such excess proceeds, at least to the extent of his unpaid repair bills.

The Court also believes that, despite Emerson's payment defaults, the Bank's agent would not have permitted the transfer of the Seneca to a third party without Emerson's agreement or at least passive acquiescence.

**22**

his son, would provide the Debtors with a means to repay their obligations to the Stephensons as the Stephensons would likely permit them to resume lease operation of the airplane to generate needed revenue for their business. A transfer in an attempt to preserve a business or in a good faith attempt to pay a creditor is not fraudulent. *See Gillickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997); *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 307 (11th Cir.1994); *Burgess*, 955 F.2d at 138. Accordingly, the Court finds that the Trustee has failed to prove that the Debtors acted with actual intent to defraud their creditors or the Trustee. Thus, despite meeting his burden of proof on three of the four elements under section 727(a)(2),[9] the Trustee's claim that the Debtors fraudulently transferred the Seneca must fail.

## 2. The Warrior

The Trustee alleges that the Debtors transferred the Warrior to Stephenson in 1996 and concealed the transfer from the Trustee with actual intent to hinder, delay, or defraud the Trustee, the IRS, and other creditors of the Debtors.[10] The Debtors contend that they had a good faith belief that they did not possess an interest in the Warrior in 1996 because they granted a security interest in the Warrior to Stephenson in 1993 in connection with the Fifth Loan and the airplane was constructively surrendered to Stephenson in March 1995 when Emerson told him that he could not repay the loan and that Stephenson should "take the airplane." The Debtors do not dispute that they transferred the Warrior to Stephenson as a result of their inability to meet their obligations under the Fifth Loan. However, they do dispute when the transfer occurred and whether they had actual intent to hinder, delay, or defraud creditors.

As stated above, the concept of a "transfer" under the Bankruptcy Code is very broad and includes "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." 11 U.S.C. § 101(54). In a routine secured loan, a "transfer" for purposes of the Bankruptcy Code occurs whenever an interest of the debtor in property is transferred. The creation of a security interest is a transfer that creates rights in the secured party, but leaves many rights in the debtor. *See* RSA 382-A:9-203. A foreclosure of a security interest will terminate most, if not all, rights of a debtor in the property subject to a security interest. *See* RSA 382-A:9-504 to 9-506; *In re Beeman*, 235 B.R. 519 (Bankr.D.N.H.1999).

On June 1, 1993, Emerson and Stephenson executed a written memorandum regarding the Fifth Loan, which provided that the loan was "to be secured with Bill of Sale lien on Piper Warrior N32560 serial # 28-7515187." Emerson signed an FAA bill of sale form and delivered it to Stephenson contemporaneously with the execution of the written memorandum. The written memorandum and the delivery of the bill of sale created a security interest in Emerson's interest in the Warrior in favor of Stephenson. *See* RSA 382-A:9-203(1). However, Stephenson's security interest had two defects. First, the security interest was not recorded with the FAA and, therefore, was not perfected against third parties without notice of the security interest. *See* RSA 382-A:9-104(a); 49 U.S.C. § 44108(a); *Philko Aviation v. Shacket*, 462 U.S. 406, 413, 103 S.Ct. 2476, 76 L.Ed.2d 678 (1983). Second, because the Warrior was registered with the FAA as jointly owned by the Debtors

---

9. The Trustee has proven (1) the Debtors (2) indirectly permitted the transfer of the Seneca (3) within one year before the filing of the Debtors' bankruptcy petition.

10. The allegation regarding concealment of the transfer itself is considered in the discussion under Count III of the Emerson Complaint. *See* note 7, *supra.*

and Brenda Emerson did not sign either the loan memorandum/security agreement or the bill of sale, Stephenson had no security interest in Brenda Emerson's interest in the Warrior. *See* RSA 382–A:9–203(1)(a).

The Debtors contend that the transfer of the Warrior occurred in 1995 when Emerson told Stephenson to "take the airplane." Stephenson took no action at that time however. It was not until 1996 that Stephenson took action by obtaining a bill of sale dated September 5, 1996 signed by the Debtors, which was recorded with the FAA on October 21, 1996. The 1996 bill of sale transferred Emerson's equity of redemption in the Warrior to Stephenson and Brenda Emerson's unencumbered interest in the Warrior to Stephenson. Accordingly, the Court finds that each of the Debtors transferred an interest in the Warrior to Stephenson within one year before the filing of their bankruptcy petition.

The Debtors testified that they considered the Warrior to be collateral for the Fifth Loan. Even though Brenda Emerson did not sign the loan memorandum or the bill of sale in 1993, she was aware of the loan and of the arrangement regarding the Warrior. Although she did not grant a security interest in her interest in the Warrior to Stephenson, she had a good faith belief that Stephenson held a security interest in the Warrior. Emerson believed that Stephenson held a security interest in the Warrior and that the execution of the bill of sale in 1996 was simply the consummation of the original loan and security agreement made with Stephenson in 1993. As explained above, the transfer of property to a secured creditor pursuant to a valid security interest is not *per se* fraudulent as to creditors. *See Brown*, 108 F.3d at 1293; *Miller*, 39 F.3d at 307. Here the Trustee has failed to present any other evidence to establish the Debtors' fraudulent intent. Accordingly, the Trustee has not met his burden of proving under section 727(a)(2) that the Debtors transferred the Warrior to Stephenson in 1996 with actual intent to hinder, delay, or defraud creditors.

### 3. Income from the Lease of the Hangars

The Trustee alleges that the Debtors concealed the lease income from their hangars from the Trustee with an actual intent to hinder, delay, or defraud an officer of the estate. The Debtors contend that the omission of the income was inadvertent, that their ownership of the hangars was disclosed in Schedule A, and that lease income was constructively disclosed in Schedule I since all net income from the hangars flowed to the Debtors through Alan Emerson Aviation, Inc. as compensation.

The evidence established that the Debtors' business was originally operated as a proprietorship known as Emerson Aviation, it was converted to a corporation in 1994 called Emerson Aviation, Inc., and, after the first corporation was dissolved in September 1996, it continued as a new corporation under the name Alan Emerson Aviation, Inc. The Debtors testified that they never executed any documents transferring or leasing their hangars to either of the corporations. The Debtors also testified that they took the net income from the business as compensation.

The Court finds that the Debtors completed their bankruptcy schedules in accordance with their long standing business practice. They disclosed their ownership of the hangars, the nature of their business operations, and the income they were receiving from the business operations. The Debtors' failure to separately disclose the income from their hangars was not seriously misleading nor would it conceal such income from a trustee exercising even minimal due diligence in a review of the Debtors' bankruptcy schedules. Accordingly, the Court finds that the Trustee has not met his burden of proof under section 727(a)(2) with respect to his allegations regarding concealment of income from the Debtors' hangars.

### 4. Possession of Assets by Stephenson

■ The Trustee alleges that (1) the Debtors dissolved and ceased operating Emerson Aviation, Inc. while in financial distress due to pressure from the FAA, the IRS, and other creditors, (2) the Debtors agreed with Stephenson and his son on a constructive repossession of the Debtors' property, (3) the Debtors formed a new corporation, and (4) they claimed their business was under new ownership without actually transferring any assets to the new corporation, all with the actual intent to hinder, delay, or defraud their creditors. The Debtors contend that (1) the September 1996 agreement with Stephenson was a bona fide attempt to save their business from foreclosure by the first mortgage through a "refinancing" from the only source of funds available to them, Stephenson, (2) their failure to execute documents formalizing the leasing of the assets by the new corporation was due to a change in lawyers, (3) they expected to be able to pay all of their debts from future business operations, and (4) the IRS debt was personal, would not be extinguished or impaired by the formation of a new corporation, and, therefore, the change in ownership to Alan Emerson Aviation, Inc. was not fraudulent as to the IRS.

It is undisputed that at the time of the agreement to form a new corporate entity to operate the Debtors' business and the constructive repossession by the Stephensons the Debtors were in financial distress. The Debtors acknowledged that after the Stephensons "repossessed" the Debtors' home, the hangar property, and the Debtors' business assets, the Debtors retained the same possession and control of the assets as they had prior to the transfer. Although the Debtors testified that they expected to make some lease or rental payments to Stephenson, the Debtors had not made any payments to either Stephenson or his son for their use of any of these assets from September 1996 until the time of trial in July 1999. Stephenson testified that he had no interest in owning the Seneca, the Warrior, or the Debtors' business. Rather, Stephenson simply wanted a place to store his airplanes, the availability of an FBO to service his aviation needs, and the repayment of the money he advanced to the Debtors. Since he acquired title or "possession" of the Debtors' assets in September 1996, Stephenson has not sought to control them, liquidate them, or otherwise press the Debtors for repayment.

Contrary to suggestions by the Trustee, the Debtors did not attempt to conceal their assets. In the answer to Question 4.b in the statement of financial affairs and in Schedule D, the Debtors disclosed the secured status of Stephenson and his son, the granting of security interests on September 16, 1996 to the Stephensons, and the "repossession" of assets pursuant to those security interests one day later on September 17, 1996. These disclosures put the Trustee on notice of the Debtors' September 1996 agreement with the Stephensons. Further, the Debtors' agreement with the Stephensons was the subject of extensive questioning by the Trustee at the first meeting of creditors.

Many of the assets "repossessed" by Stephenson and his son were at the time subject to prior liens and encumbrances. At trial, no one offered any evidence indicating that the Debtors in fact executed a security agreement with respect to the property identified in the September 1996 UCC financing statements or that the UCC financing statements were properly recorded with the Gilford Town Clerk and the Secretary of State.[11] *See* RSA 382–A:9–203(1) and 382–A:9–401(1)(c). Although the Debtors and Stephenson had a long history of rarely consulting with legal

---

11. The only recorded UCC financing statements produced at trial were recorded at the Belknap County Registry of Deeds.

counsel in their business dealings with third parties and each other, in September 1996 they retained their own legal counsel. The Debtors were not then contemplating bankruptcy. In fact, a few weeks later when the Debtors new accountant suggested a bankruptcy filing, their legal counsel refused to work on such a filing and withdrew from representing the Debtors.

Based upon all of the evidence presented at trial, the Court finds that the Debtors' September 1996 transactions with the Stephensons were an attempt to preserve an ongoing business operation from which they could earn a living and pay their obligations to creditors. While the agreement may have preferred Stephenson and his son, it was not entered into with fraudulent intent. *See Brown,* 108 F.3d at 1293; *Miller,* 39 F.3d at 307. Accordingly, the Court finds that the Trustee has not met his burden of proof under section 727(a)(2) regarding the Debtors' transfer of assets to Stephenson and his son in September 1996.

**B. Count II: Denial of Discharge under 11 U.S.C. § 727(a)(3)**

To satisfy the requirements of section 727(a)(3) of the Bankruptcy Code, the Trustee must prove by a preponderance of the evidence that either:

1. The Debtors failed to keep or preserve recorded information, including books, documents, records, and papers, and that by failing to keep or preserve such books, documents, records, and papers, it is impossible to ascertain the financial condition and material business transactions of the Debtors; or

2. The Debtors destroyed, mutilated, falsified, or concealed recorded information, including books, documents, records, and papers, and that by destroying, mutilating, falsifying, or concealing such books, documents, records, and papers, it is impossible to ascertain the financial

condition and material business transactions of the Debtors.

*See* 11 U.S.C. § 727(a)(3). The Trustee has not made any allegations that the Debtors "destroyed, mutilated, falsified, or concealed" any documents, records, or papers. Accordingly, he bases his cause of action on the fact that the Debtors failed to keep adequate written records of their business transactions.

When a debtor's right to discharge is challenged under section 727(a)(3), the trustee or objecting creditor has the initial burden to establish that the debtor's records are inadequate for determining the financial affairs or business transactions of the debtor. *See McGowan v. Beausoleil (In re Beausoleil),* 142 B.R. 31, 37 (Bankr.D.R.I.1992); *American Motors Leasing Corp. v. Morando (In re Morando),* 116 B.R. 14, 15 (Bankr.D.Mass. 1990). Once the trustee or objecting creditor has met his initial burden, the burden shifts to the debtor to establish either that the debtor maintained adequate books and records from which his financial condition can be ascertained or that the failure to keep adequate books and records was justified under the circumstances. *See Beausoleil,* 142 B.R. at 37; *Morando,* 116 B.R. at 15. "Whether a failure to keep records, total or partial, will be justified is a question of fact to be determined in each instance under the particular circumstances of the case.... In short, what is required is records that are 'reasonable under the circumstance.'" *Harman v. Brown (In re Brown),* 56 B.R. 63, 66 (Bankr.D.N.H. 1985). "It is sufficient if the books and records are kept, if required at all, so as to reflect with a fair degree of accuracy, the debtor's financial condition and in a manner appropriate to his business." *Id.* at 67. The Court has wide discretion in determining whether the books and records produced by debtors are sufficient to meet the requirements of section 727(a)(3). *See id.* at 66; *Morando,* 116 B.R. at 15. Doubts as to the adequacy of the records should be resolved in favor of the honest

debtor. *See Wortman v. Ridley (In re Ridley)*, 115 B.R. 731, 733 (Bankr.D.Mass. 1990).

■ The Trustee alleges specifically that the Debtors did not keep any records of the transfers of the Seneca or the Warrior nor any record of the amounts they owed to Stephenson or his son. The Trustee alleges that these failures made it impossible for Debtors' counsel to accurately prepare their schedules and for the Trustee to accurately determine the Debtors' financial condition. The Debtors maintain that they have kept adequate records. They also state that, despite their having made it clear to the Trustee that all records in their possession or their agent's possession are available for the Trustee's inspection, neither the Trustee nor his counsel has made any request to review or inspect their records.

The evidence is not clear whether the Debtors maintained records on the transfer of the two airplanes or whether any such records were given to their accountant. However, since the bills of sale are recorded in a public record maintained by the FAA, they are available to both the Trustee and the Debtors, if needed. *See Beausoleil*, 142 B.R. at 37 (stating that "the duty to keep books and records is not absolute and depends on the circumstances"). Further, the Debtors' accountant and attorney are experienced bankruptcy practitioners who apparently did not ask for additional documents beyond those received by them from the Debtors' previous accountant. In addition, there is no evidence that the inadequacy of the Debtors' records led to a failure to prepare and file tax returns in a timely basis.

The Court notes that neither one of the Debtors has any significant business administration experience beyond that obtained through the operation of their FBO business for approximately twenty years prior to the filing of their bankruptcy petition. During most of that period their major source of business financing was from a customer, friend, and fellow avia-

tion enthusiast, Stephenson. Both Stephenson and the Debtors were content to let Stephenson keep a record of what was owed with updates on a periodic basis. The Court notes that the Debtors' business practice in this respect is similar to that of many borrowers who rely on their lender's record of their loan balance. While such a practice may not be a model of business administration, none of the parties to these adversary proceedings have disputed the numbers that are reflected in Stephenson's records or argued that any party was misled by the absence of any records. More importantly, no evidence was offered that would suggest that the Trustee had difficulty determining the Debtors' general financial condition. *See Ridley*, 115 B.R. at 733 (stating that the creditor is burdened with proving that the debtor's financial condition cannot be ascertained). For these reasons, the Court finds that the Trustee has not met his initial burden of proof under section 727(a)(3). Accordingly, relief under Count II is denied.

## C. Count III: Denial of Discharge under 11 U.S.C. § 727(a)(4)(A)

■ To meet his burden under section 727(a)(4)(A) of the Bankruptcy Code, the Trustee must prove by a preponderance of the evidence that the Debtors knowingly and fraudulently, in or in connection with their case, made a false oath or account relating to a material fact. *See, e.g., Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 764 (1st Cir.1994); *Tully*, 818 F.2d at 110; *Smith v. Grondin (In re Grondin)*, 232 B.R. 274, 276 (1st Cir. BAP 1999). A debtor's schedules and statement of financial affairs are unsworn declarations made under penalty of perjury and are the equivalent of a verification under oath. *See Grondin*, 232 B.R. at 276. A fact is material when it bears a relationship to the debtor's business transactions or concerns the discovery of assets, business dealings, or the existence and disposi-

tion of the debtor's property. *See id.* (citing *Tully*, 818 F.2d at 110–11).

The Courts have held that a debtor's discharge should not be denied under section 727(a)(4)(A) if the false statement or omission is due to mistake or inadvertence or if the mistake is technical and not real. *See Gordon v. Mukerjee (In re Mukerjee)*, 98 B.R. 627, 629 (Bankr. D.N.H.1989). "A trivial matter which has but little effect upon the estate and the creditors is treated as immaterial." *In re Irving*, 27 B.R. 943, 945 (Bankr.E.D.N.Y. 1983) (quoted in *Mukerjee*, 98 B.R. at 629). A debtor's reckless indifference to the truth, however, has been consistently treated by the courts as the functional equivalent of fraud. *See Grondin*, 232 B.R. at 277–78.

The Trustee specifically alleges that (1) the Debtors failed to disclose the transfers of the Seneca and the Warrior on their schedules and statement of financial affairs, and (2) the Debtors falsely stated in their schedules, answers to interrogatories, and at the section 341 meeting that Stephenson and his son were in possession of their property and had been asked by Stephenson to continue to run it. The Debtors argue that (1) even if statements made by them were in fact incorrect, they did not knowingly make any false oath or account, (2) the schedules were prepared by the Debtors' counsel and accountant and were true and correct as far as the Debtors understood them, and (3) the Debtors relied upon the expertise and advice of the professionals employed by them.

The Trustee has established that the Debtors did not disclose the transfer of the Seneca to William Stephenson in their schedules or statement of financial affairs. The Debtors do not dispute this contention, but argue that there was nothing to disclose because the Debtors did not transfer the Seneca and they did not believe that they had any interest in the airplane at the time it was transferred. According to the Debtors, they could not have had any actual intent to conceal an interest in the Seneca from the Trustee.

In order to have actual intent to conceal property, the Debtors must have believed that they had an interest in the Seneca or they must have acted with such reckless disregard that they would be deemed to have an intent to conceal that interest from the Trustee. *See Kaler v. McLaren (In re McLaren)*, 236 B.R. 882, 895 (Bankr.D.N.D.1999). The evidence establishes that the Debtors did not believe that they had any interest in the Seneca and for that reason they failed to disclose its transfer in their statement of financial affairs. Brenda Emerson testified that she answered all of her counsel's questions over the course of several meetings regarding the preparation of the schedules. The Debtors also testified that they had little opportunity to review the schedules because their counsel presented the documents to them the evening before the first meeting of creditors. While the failure of a debtor to review the schedules before signing them under the penalty of perjury might evidence a reckless disregard for the accuracy and completeness of the schedules, on the facts of this case, as established by the evidence at trial, the Court cannot find that the Debtors knowingly or fraudulently made a false oath with respect to the Seneca. The Court finds that the Trustee has not met his burden of proof under section 727(a)(4)(A) regarding the Debtors' concealment of the transfer of the Seneca from creditors or the Trustee.

The Court finds that the Trustee has proven that the Debtors concealed the transfer of the Warrior from the Trustee with actual intent to hinder, delay, or defraud an officer of the bankruptcy estate. The Debtors knowingly and fraudulently failed to list the transfer in response to Questions 4.b, 5, or 10.a of the statement of financial affairs. Despite extensive questioning at the first meeting of creditors by the Trustee regarding the Debtors'

business operations and the Stephensons' repossession of the Debtors' assets, the Debtors made no mention of the Warrior transfer.

The Debtors have been involved in civil aviation for more than twenty years. Both of the Debtors testified about the necessity of recording a bill of sale with the FAA in order for the transfer of an airplane to be effective. Brenda Emerson testified that since 1976 the Debtors have been involved, either as principals or as brokers, in the sale of an average of five airplanes per year. The Debtors testified that, prior to the Warrior transfer, they had previously had to sign new bills of sale when the FAA refused to record a bill of sale with a "stale" date. In addition, Emerson had previously signed and delivered bills of sale in other transactions without obtaining Brenda Emerson's signature, even though she was a co-owner of the airplane in question. In those cases Emerson was also required to provide a corrected bill of sale.

Despite the Debtors' knowledge regarding bills of sale for airplanes, the need for recording with the FAA, and their contention that Swain remained the owner of the Seneca until he delivered a new bill of sale to William Stephenson in June 1996, the Debtors claim to believe that Emerson's delivery of a defective bill of sale to Stephenson in 1993 was sufficient to effectuate a transfer of the Warrior. According to the Debtors, the delivery and recording of a corrected bill of sale less than six months before the petition date did not result in a transfer to Stephenson within the one year prior to bankruptcy. The Debtors' inconsistent positions regarding two transfers occurring three months apart, less than a year before the filing of their petition, cannot be reconciled. Based upon the Debtors' experience and familiarity with FAA registration procedures, the Court finds that the Debtors were aware of the significance of signing and delivering a properly executed bill of sale to Stephenson on September 5, 1996 for re-cording with the FAA. The signing, delivery, and recording of the corrected bill of sale for the Warrior occurred within one year of the Debtors' bankruptcy filing and should have been disclosed to the Trustee on the Debtors' statement of financial affairs. It was not. Even when questioned in detail at the first meeting of creditors, the Debtors did not mention the delivery and recording the bill of sale for the Warrior, an asset worth approximately $20,-000.00. The Debtors should not have been concerned about disclosure to the Trustee if they believed that Stephenson had a valid lien on the Warrior.

 Based upon the foregoing, the Court finds that the Trustee has met his burden of proof under section 727(a)(4)(A) with respect to the Debtors' knowing and fraudulent failure to disclose the transfer of the Warrior in response to Questions 4.b, 5, or 10.a in the statement of financial affairs. The Court finds that the Debtors concealed the transfer of the Warrior from the Trustee with actual intent to hinder, delay, or defraud an officer of the estate. Because all that is required for a denial of discharge under section 727(a)(4)(A) is a single false oath or account, *see Grondin,* 232 B.R. at 277, the Court finds that neither of the Debtors is entitled to a discharge. The Court further finds that the Trustee did not meet his burden of proof on the remaining allegations under Count III.

### D. Count IV: Denial of Discharge under 11 U.S.C. § 727(a)(5)

 To warrant denial of the Debtors' discharge under section 727(a)(5) of the Bankruptcy Code, the Trustee must prove by a preponderance of the evidence that the Debtors failed to explain satisfactorily any loss of assets or any deficiency of assets to meet the Debtors' liabilities. "Section 727(a)(5) is broadly drawn and clearly gives a court broad power to decline to grant a discharge in bankruptcy where the debtor does not adequately explain a shortage, loss, or disappearance of

assets." *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 886 (7th Cir.1983); *see also In re D'Agnese*, 86 F.3d 732, 734 (7th Cir.1996). In determining whether to grant a discharge under section 727(a)(5), a court is interested in what happened to a debtor's assets and not in the wisdom of the debtor's disposition of the assets. *See D'Agnese*, 86 F.3d at 735; *Riso*, 74 B.R. at 760; *Indian Head Nat'l Bank v. Mitchell (In re Mitchell)*, 74 B.R. 457, 462 (Bankr.D.N.H.1987) ("Section 727(a)(5) is narrowly drawn and has to do with only whether the debtor has satisfactorily explained what actually has happened to his assets, regardless of whether his disposition is deemed proper or improper."). Unlike other subsections of section 727, section 727(a)(5) does not require fraudulent intent. *Prairie Prod. Credit Assoc. v. Suttles (In re Suttles)*, 819 F.2d 764, 766 (7th Cir.1987); *Ehle v. Brien (In re Brien)*, 208 B.R. 255, 258 (1st Cir. BAP 1997).

■ To the extent that the Trustee's allegations under section 727(a)(5) relate to the disposition of the Seneca and the Warrior, the Court finds that the Debtors have satisfactorily explained the transfers of these assets during the course of their case, either at the first meeting of creditors, through discovery, or during trial. *See RicNick's Fitness Center, Inc. v. Hicks (In re Hicks)*, 71 B.R. 508, 510 (Bankr.D.N.H.1987) (suggesting that a debtor may avoid denial of his discharge under section 727(a)(5) if he accounts fully for the disposition of his assets at any stage of the bankruptcy proceeding from discovery through trial). The Debtors have explained that they transferred the Warrior to Stephenson when they were no longer able to make payments on the Fifth Loan, and that Swain, the record owner of the Seneca, transferred that airplane to William Stephenson in 1996 upon threat of foreclosure by the Bank.

The Trustee has also alleged that the Debtors falsely represented to the Trustee at the first meeting of creditors that Ste-

phenson and his son were in possession of the Debtors' property and that this misrepresentation constitutes a failure to satisfactorily explain the disposition of the Debtor's assets. During the course of their case, the Debtors have explained that as result of the meeting that took place in September 1996 they believed that Stephenson and his son were in possession of their property. They also acknowledged that nothing in their relationship changed after the September 1996 meeting with respect to the operation of their business. The Debtors continued to occupy their home and the hangars and to provide aviation services, without paying any rent to the Stephensons. The Debtors did not conceal any of this information from the Trustee or their creditors.

The Court further notes that it conducted a three day trial of this case during which the parties presented extensive testimonial and documentary evidence on the transfer and disposition of the Debtors' assets. At no time during the trial, however, did the Trustee identify any material asset, other than those discussed above, which was lost or unaccounted for as of the time of trial. In the absence of evidence of any missing assets, the Trustee's claims under Count IV of the Emerson Complaint must be denied. The Court finds that the Trustee has not met his burden of proof under section 727(a)(5) regarding the Debtors' alleged failure to explain the disposition of their assets.

## IV. The Stephenson Complaint

For the reasons discussed below, the Court grants in part and denies in part the Trustee's claims under sections 547 and 548 in Counts I and II of the Stephenson Complaint. The Court grants the Trustee's claims under section 544 and the UFTA contained in Count III of the Stephenson Complaint.

### A. Count I: Avoidance of Preferences under 11 U.S.C. § 547

The Trustee contends that the transfer of the Seneca, the transfer of the Warrior,

and the alleged granting of security interests in favor of the Stephensons were all preferential because Stephenson, and his son, were insiders. The Trustee argues that the Stephensons acquired their status as insiders by virtue of Stephenson's long relationship with the Debtors during which he provided the Debtors with capital availability in the form of open-ended loans, which were not on ordinary business terms, and exercised control over the Debtors' business operations. Stephenson and his son deny that they are insiders and contend that the transfers are not avoidable under section 547(b) of the Bankruptcy Code because (1) the Debtors did not have an interest in the Seneca at the time of the transfer as required by section 547(b); (2) the Warrior was transferred outside the one year look back period contained in section 547(b)(4)(B); (3) there was no antecedent debt owed to William Stephenson, which is required by section 547(b)(2); (4) the transfers were made in the ordinary course of business, which is a defense under section 547(c)(2); and (5) the Stephensons did not receive any benefit that would exceed what they would have received in liquidation, a requirement of section 547(b)(5).

The Trustee can avoid a transfer of an interest of the Debtors in property as a preference if the transfer was made:

1. To or for the benefit of a creditor;

2. For or on account of an antecedent debt owed by the Debtors before the transfer was made;

3. While the Debtors were insolvent;

4. Within ninety days before bankruptcy or between ninety days and one year before bankruptcy, if the transferee was an insider at the time of the transfer; and

5. The transfer enables the creditor to receive more than it would receive if the case were a case under Chapter 7 of the Code, the transfer had not been made, and the creditor received payment of its debt to the extent provided by the Code.

*See* 11 U.S.C. § 547(b).

### 1. Effective Date of the Transfers for Purposes of Section 547

Stephenson contends that the determination of when a transfer occurs is controlled by section 101(54) of the Bankruptcy Code and that the Trustee does not have the benefit of the status of a bona fide purchaser under section 544(a)(3) because the property involved is not real estate. However, section 547 of the Bankruptcy Code itself contains the determination of when a transfer is effective. For purposes of section 547, a transfer of personal property is perfected when "a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." 11 U.S.C. § 547(e)(1)(B). Pursuant to section 547(e)(2), if a transfer is perfected within ten days, the date of the transfer relates back to the time the transfer takes effect between the parties. If the transfer is not perfected within ten days, the date of transfer is the date of perfection. *Grover v. Gulino (In re Gulino)*, 779 F.2d 546, 549 (9th Cir.1985).

In the case of the Seneca and the Warrior, the date of perfection would be the date that the bill of sale or security interest was recorded with the FAA. *See* 49 U.S.C. § 44108(a); *Philko*, 462 U.S. at 413, 103 S.Ct. 2476. Because the transfers of the Seneca and the Warrior were perfected more than ten days after the date of execution and the delivery of the bills of sale to William Stephenson and Stephenson, respectively, the time of transfer of the airplanes for purposes of section 547 is the date of recording with the FAA. Those dates are August 6, 1996 for the Seneca and October 21, 1996 for the Warrior.

With respect to the granting of a security interest in all of a debtor's business assets, the effective date of the transfer would be the date the transferee's security interest was perfected under ap-

plicable state law. *See Harbor Nat'l Bank of Boston v. Sid Kumins, Inc.,* 696 F.2d 9, 11 (1st Cir.1982); *Drummond v. C.D. Oil Co. (In re Murdock),* No. 92–41668–7, 1993 WL 943266, at *10 (Bankr.D.Mont. Aug. 3, 1993). Pursuant to state law, the perfection of the Stephensons' security interests in the Debtors' business assets would have occurred on the date the UCC financing statements were recorded, unless Stephenson or his son maintained continuous possession of the assets. *See* RSA 382–A:9–302. No evidence was submitted at trial that would establish that either of the Stephensons had continuous possession of these assets. Further, there was no evidence submitted at trial that would even establish that the Stephensons had a security interest in the Debtors' business assets. In the absence of a signed security agreement, Stephenson and his son would have had no security interest to perfect unless they maintained continuous possession of the collateral, which they admittedly did not. *See* RSA 382–A:9–203(1)(a). The parties did not submit any evidence that the Debtors executed a signed security agreement in connection with their September 1996 agreement.

If a valid security agreement had existed in September 1996, absent continuous possession by the Stephensons, any security interest created by such an agreement could be perfected only by filing. *See* RSA 382–A:9–401(1). At trial the parties introduced into evidence two sets of financing statements that were filed on September 16, 1996 in the Belknap County Registry of Deeds. The parties did not present any evidence that these financing statements were filed with the Gilford Town Clerk, the Secretary of State, or the FAA. Because the alleged security interests were not perfected at the time the Debtors commenced their bankruptcy case, any transfers to Stephenson or his son under the September 1996 agreement are deemed to have occurred immediately before the filing of the Debtors' petition (i.e., January 30, 1997). *See* 11 U.S.C. § 547(e)(2)(C).

**2. Defendants as Insiders**

Since the transfers of the Seneca and the Warrior occurred more than ninety days but less than one year before the filing of the Debtors' bankruptcy petition, the Trustee cannot avoid those transfers under section 547(b) unless he can establish that Stephenson and his son were insiders. The determination of whether a person is an insider is a question of fact, and it is one on which the Trustee bears the burden of proof at trial. *See Browning Interests v. Allison (In re Holloway),* 955 F.2d 1008, 1014 (5th Cir. 1992); *Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman),* 126 B.R. 63, 70 (9th Cir. BAP 1991); *Damir v. Trans-Pacific Nat'l Bank (In re Kong),* 196 B.R. 167, 171 (N.D.Ca.1996); *Lingley v. Stuart Shaines, Inc. (In re Acme–Dunham Inc.),* 50 B.R. 734, 739 (D.Me.1985); 11 U.S.C. § 547(g). Once the underlying facts are resolved, however, insider status ultimately is a question of law. *See Holloway,* 955 F.2d at 1014.

An "insider" of an individual debtor includes:

1. A relative of the debtor;

2. A partnership in which the debtor is a general partner;

3. A general partner of the debtor; or

4. A corporation of which the debtor is a director, officer, or person in control.

11 U.S.C. § 101(31); *cf.* RSA 545–A:1(VII). The use of the word "includes" in the Bankruptcy Code definition of an insider is not a limiting term and the classification of insiders is not restricted to the statutory definition. *See Schuman,* 81 B.R. at 586; *Loftis v. Minar (In re Montanino),* 15 B.R. 307, 310 (Bankr.D.N.J. 1981). The legislative history of 11 U.S.C. § 101(31) states that "[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those deal-

ing at arms length with the debtor." S.Rep. No. 989, 95th Cong., 2d Sess. 25 (1978), U.S.Code Cong. & Admin. News pp. 5787, 5810; H. Rep. No. 595, 95th Cong., 1st Sess. 312 (1977), U.S.Code Cong. & Admin. News pp. 5963, 6269.

■■■ Cases that have considered the insider issue generally have focused on two factors in making the determination of whether a transferee is an insider: (1) the closeness of the relationship between the transferee and the debtor, and (2) whether the transactions between the transferee and the debtor were conducted at arm's length. *See Holloway*, 955 F.2d at 1011; *Matson v. Strickland (In re Strickland)*, 230 B.R. 276, 285 (Bankr.E.D.Va.1999). The following factual issues are helpful in determining whether a transferee is an insider:

1. Whether the loans made to the debtor were documented (e.g., promissory note, mortgage, and specified repayment terms), *see Montanino*, 15 B.R. at 310; *Koch v. Rogers (In re Broumas)*, 203 B.R. 385, 391 (D.Md. 1996), *aff'd in part and rev'd in part* 135 F.3d 769 (4th Cir.1998);

2. Whether the loans were made on an unsecured basis and without inquiring into the debtor's ability to repay the loans, *see Holloway*, 955 F.2d at 1012; *Rush v. Riddle (In re Standard Stores, Inc.)*, 124 B.R. 318, 325 (Bankr.C.D.Cal.1991);

3. Whether the transferee knew that the debtor was insolvent at the time the debtor made the loans or recorded the security agreements, *see Holloway*, 955 F.2d at 1012;

4. Whether there were numerous loans between the parties, *see Strickland*, 230 B.R. at 286;

5. Whether there were any strings attached as to how the debtor could use loan proceeds, *see id.*;

6. Whether the loans were commercially motivated, *see Holloway*, 955 F.2d at 1012;

7. Whether the transferee had an ability to control or influence the debtor, *see Kong*, 196 B.R. at 171; *Freund v. Heath (In re McIver)*, 177 B.R. 366, 370 (Bankr.N.D.Fla.1995); *Sticka v. Anderson (In re Anderson)*, 165 B.R. 482, 487 (Bankr.D.Or.1994); *Torcise v. Cunigan (In re Torcise)*, 146 B.R. 303, 305–06 (Bankr. S.D.Fla.1992);

8. Whether there was a personal, business, or professional relationship between the transferee and the debtor allowing the transferee to gain an advantage such as that attributable simply to affinity, *see McIver*, 177 B.R. at 370; *Friedman*, 126 B.R. at 70;

9. Whether the transferee had authority to make business decisions for the debtor, *see Kong*, 196 B.R. at 172;

10. Whether there is evidence of a desire to treat the transferee differently from all other general unsecured creditors, *see Montanino*, 15 B.R. at 310; and

11. Whether there was an agreement among the parties to share profits and losses from business transactions, *see Friedman*, 126 B.R. at 70.

As detailed above in the Court's factual findings, the evidence at trial established that Stephenson and the Debtors had a long term relationship during which Stephenson made a series of loans to the Debtors. *See Strickland*, 230 B.R. at 286. In 1978, Stephenson loaned Emerson $2,928.93 for construction of an office and $6,300.00 for the purchase of fuel inventory. These loans were documented, but were made on an unsecured basis. *See Holloway*, 955 F.2d at 1012; *Standard Stores*, 124 B.R. at 325. In 1983, Stephenson designed an aircraft hangar and advanced approximately $30,000.00 to the Debtors on an unsecured basis to purchase materials for the construction of the hangar on their property. *See Holloway*, 955 F.2d at 1012; *Strickland*, 230 B.R. at 286; *Standard Stores*, 124 B.R. at 325. This

new loan was made despite the Debtors' failure to pay the First and Second Loans in accordance with their terms. Stephenson and the Debtors consolidated the $30,000.00 loan with the balance due on the First and Second Loans in a new Third Loan with a total amount due of $41,030.59.

Over the next nine years the Debtors did not service the Third Loan. However, Stephenson advanced some funds towards the construction of another hangar and credited the Debtors for fuel and repair services provided to him. Despite the Debtors' demonstrated inability to service their obligations to him from 1978 to 1992, Stephenson advanced an additional $53,000.00 to the Debtors on November 27, 1992 for the purchase of another hangar. Stephenson then consolidated the balance of $99,966.00 due on the nine year old Third Loan with the new obligation into the Fourth Loan with a total outstanding balance of $152,966.00.

When the Fourth Loan closed between the parties, Stephenson claimed to "own" all of the hangar buildings and, for the first time, to have security in the form of a third mortgage on the Debtors' residence and hangars to secure his position. Stephenson testified that these loans were motivated in part by his need for the services of an FBO at Laconia Airport, but mostly by the fact that he could earn a better return on his money from these loans than he could in the stock market. Stephenson anticipated receiving periodic payments from the Debtors when he retired from his own business.

At the time the Fourth Loan was arranged in 1992, Stephenson was in a position to actually exercise control over the Debtors' business operations due to the Debtors' total reliance on him for financing. At trial the Debtors testified that financing from banks or other institutional investors was not available to them. The agreement for the Fourth Loan in 1992 was written as a lease purchase agreement under which Stephenson "owned" all of the

Debtors' hangars located on their property. The Debtors would "purchase" back an interest in the hangars as their obligations were repaid over twenty years. Although the lease purchase agreement was not accurate in a technical legal sense, it does reflect a layman's view of the relationship between the parties as of 1992 and it recognized Stephenson's *de facto* status. While Stephenson did not actually control the day-to-day operations of the Debtors' business, he had the ability to control or influence the Debtors' decisions through the exercise of discretion in loaning money and forbearing from exercising his remedies upon default. *See Kong,* 196 B.R. at 171; *McIver,* 177 B.R. at 370; *Anderson,* 165 B.R. at 487; *Torcise,* 146 B.R. at 305–06.

Although Stephenson may not have known whether the Debtors were insolvent at the time he made loans to them, after the first two loans he was on notice that the Debtors could not regularly service their obligations to him. *See Holloway,* 955 F.2d at 1012. Yet Stephenson continued to loan money and to forbear from exercising remedies without asking for financial information or assurances. *See id.* Although each loan between the parties was documented and was made on reasonable business terms, Stephenson's decision to make the Fourth Loan in 1992 and his administration of the loan relationship for the ten years preceding the filing of the Debtors' bankruptcy petition was not consistent with an arm's length transaction motivated by commercial or investment considerations. *See id.*

Further, the Debtors have continued operating the FBO business since September 1996 despite the "repossession" of all assets by Stephenson and his son. The parties did not offer any evidence that would reflect an agreement, written or oral, regarding the Debtors' use of such property during that time. The Debtors testified that they expected to make lease payments to Stephenson, but those payments had not commenced as of the time of trial, some

forty-six months after the Stephensons' "repossession." This further bolsters the Trustees' contention that the Stephensons are insiders.

■ Stephenson's most compelling argument in support of his contention that he was not an insider is based upon the absence of any agreement with the Debtors to share profits and losses from the investments made with the proceeds of his loans. *See Friedman,* 126 B.R. at 70. The Trustee presented no evidence reflecting any agreement to share profits and losses. However, while the absence of any such agreement is a significant factor in determining the insider status of Stephenson in this case, it is not controlling.

When viewed over time, the relationship between the Debtors and Stephenson, as evidenced by the conduct of the parties, does not resemble an arm's length relationship. Rather it reflects a close personal and business relationship more akin to a familial relationship. *See McIver,* 177 B.R. at 370; *Friedman,* 126 B.R. at 70. Accordingly, the Court finds that Stephenson is an insider of the Debtors.

No evidence was presented that William Stephenson had any direct relationship with the Debtors that was not derivative of his father's relationship with them. William Stephenson was not present at the trial and was not called as a witness by any party. The parties did present evidence, however, that in March 1994 William Stephenson purchased a note from AMRESCO, which was secured by a second mortgage on the Debtors' home and hangar property. The record lacks any direct evidence as to William Stephenson's motivation in purchasing the note. Given all the circumstances, however, the Court concludes that William Stephenson's involvement in the Debtors' business resulted from his interest in helping protect his father's investments or in becoming a co-venturer with his father. In either event, his involvement is not distinguishable from

that of his father's and the Court finds that he is also an insider. *See Rafoth v. Bailey (In re Baker & Getty Fin. Servs., Inc.),* 88 B.R. 792, 798 (Bankr.N.D.Ohio 1988).

### 3. Trustee's Claims under Section 547

#### a. Transfer of the Seneca to William Stephenson

■ Stephenson and his son argue that the Debtors had no interest in the Seneca and, therefore, no transfer occurred between the Debtors and William Stephenson which can be attacked by the Trustee under section 547. For the reasons discussed in the Court's findings under Count I of the Emerson Complaint,[12] the Court finds that the Debtors had an equitable interest in the Seneca to the extent that its value exceeded the amount owed to the Bank. It is that equitable claim which the Debtors allowed to be transferred to William Stephenson. The parties' recognition of that equitable claim is what led to the "loose" agreement between the Debtors and the Stephensons on possible future credits against the Debtors' obligations to William Stephenson.

William Stephenson acquired ownership of the Seneca by paying off the balance of the Bank's loan secured by the airplane in the amount of $6,070.08. After his purchase, the Debtors controlled and managed the leasing of the Seneca with an expectation, but no binding agreement, that some credit could be obtained on their outstanding obligations to Stephenson's son depending upon the ultimate value of the airplane. Accordingly, the Debtors' equitable interest in the Seneca was transferred on account of an antecedent debt.

The Trustee established that the Debtors were insolvent at the time of the transfer of the Seneca by virtue of the entry of the $185,000.00 judgment against Emerson by the District Court on April 24, 1996. In addition, in their separate answers to

---

12. *See* section III.A.1 of this opinion.

the Trustee's interrogatories, the Debtors each admitted that they were insolvent at the time of the transfer of the Seneca. The Trustee proved that the effective date of the transfer of the Seneca for purposes of section 547 was August 6, 1996, less than a year before the filing of the Debtors' bankruptcy petition.

The final element which the Trustee must establish in order to avoid the transfer of the Debtors' equitable interest in the Seneca is that the transfer enabled Stephenson or his son to receive more than they would have received if the transfer had not been made and the bankruptcy estate were liquidated under Chapter 7 of the Bankruptcy Code. Stephenson testified that he had obtained an appraisal valuing the Seneca at $55,000.00. However, the Debtors testified that despite extensive efforts to sell the Seneca and recover something on their claim for repairs to the airplane, they never received an offer for an amount that was greater than the balance due the Bank at the time of the offer. The Trustee introduced evidence from the owner of a competing FBO at Laconia Airport that the two engines on the Seneca might be worth $6,000.00 to $8,000.00 each. However, the witness was not qualified as an expert, and he admitted that he had not inspected the Seneca. In addition, there was undisputed testimony that the Seneca's two gear up landings and the high number of engine hours since the last overhaul seriously depressed the value of the airplane as of the time of the transfer. Emerson testified that after the Bank indicated that it would repossess the Seneca in December 1995, he advertised the airplane in a trade journal. Emerson had few inquiries as a result of the advertisement and those that did look at the Seneca failed to make any offer once they learned of the airplane's crash history. For these reasons, the Court finds that the evidence does not establish that the Seneca's value is greater than the amount paid to the Bank by William Stephenson to acquire title to the airplane. Accordingly, the Trustee has not met his burden of proof on each element of his claim under section 547(b) of the Bankruptcy Code and his request to avoid the transfer of the Debtors' equitable interest in the Seneca is denied.

### b. Transfer of the Warrior to Stephenson

For the reasons discussed in the Court's findings regarding the Warrior under Count I of the Emerson Complaint[13] and in Count I of the Stephenson Complaint,[14] the Court finds that the Debtors transferred the Warrior to Stephenson within one year of the filing, on October 21, 1996, on account of the Fifth Loan, an antecedent debt, while the Debtors were insolvent. Further, as discussed in the Court's findings regarding the Warrior under Count I of the Emerson Complaint,[15] the Court finds that Stephenson at best had an unperfected security interest in Emerson's interest in the Warrior one year before the filing of the bankruptcy petition. However, Stephenson did not acquire any perfected interest in the Warrior, for purposes of section 547 of the Bankruptcy Code, until the filing of the bill of sale with the FAA on October 21, 1996. Accordingly, as a result of the transfer, Stephenson received more than he would have received under Chapter 7. The Trustee has met his burden of proof under section 547(b) with respect to the transfer of the Warrior. The transfer of the Warrior is avoided and, pursuant to 11 U.S.C. §§ 550(a) and (c), the Trustee may recover the Warrior from Stephenson. Pursuant to 11 U.S.C. § 551, the avoided transfer is automatically preserved for the benefit of the estate.

13. *See* section III.A.2 of this opinion.

14. *See* sections IV.A.1 and IV.A.2 of this opinion.

15. *See* section III.A.2 of this opinion.

### c. September 1996 Security Interests

The granting of a security interest is a transfer that may be avoided under section 547 of the Bankruptcy Code. *See Grella v. Salem Five Cent Savings Bank*, 42 F.3d 26, 34 (1st Cir.1994); *Braunstein v. Karger (In re Melon Produce, Inc.)*, 976 F.2d 71, 74 (1st Cir.1992); *Vogel v. Russell Transfer, Inc.*, 852 F.2d 797, 798 (4th Cir.1988); *In re Sirius Sys., Inc.*, 112 B.R. 50, 55 n. 1 (Bankr.D.N.H. 1990). As discussed above, no documentary evidence of a written security agreement regarding the alleged September 1996 security interests was submitted at trial. It is undisputed that Stephenson and his son never actually repossessed and maintained possession of any personal property assets of the Debtors. Even if the Stephensons were deemed to have had possession for a metaphysical moment when they constructively repossessed property in which they had previously been granted security interests through an oral agreement with the Debtors and their counsel, such virtual security agreements are not valid under applicable state law. *See* RSA 382–A:9–302. Further, even if Stephenson and his son did hold valid security interests as a result of something that occurred in September 1996, no evidence of perfection of these security interest, other than a fixture filing in the Belknap County Registry of Deeds, was presented at trial and, accordingly, the granting of any such security interest in property other than fixtures would be deemed to have occurred immediately before the filing of the bankruptcy petition. *See* 11 U.S.C. § 547(e)(2)(C).

The UCC financing statements filed in the Belknap County Registry of Deeds do not meet the requirements of a valid security agreement. *See* RSA 382–A:9–302. Accordingly, the Court finds that there was no effective grant of a security interest to Stephenson or his son in September 1996 and therefore nothing to be avoided. However, for the reasons set forth in the Court's findings above under Count I of the Stephenson Complaint,[16] to the extent that any security interests were granted, the Court finds that the Trustee has met his burden of proof under section 547 and may avoid any such security interests. Pursuant to 11 U.S.C. § 551, the avoided transfers are automatically preserved for the benefit of the estate.

### B. Count II: Fraudulent Transfers under 11 U.S.C. § 548

The Trustee alleges that the transfer of the Seneca, the transfer of Warrior, and the alleged granting of security interests to the Stephensons were all fraudulent under section 548 of the Bankruptcy Code. Stephenson and his son contend that the Debtors transferred no interest in the Seneca. They also contend that the Debtors did not have fraudulent intent with respect to the transfer of the Warrior or the alleged granting of the security interests.

"Section 548 . . . allows the Trustee to avoid a transaction made within one year before the commencement of the bankruptcy case, that depletes the debtor's assets to the detriment of the bankruptcy estate. The statute recognizes as fraudulent those transfers made with actual intent to hinder, delay or defraud creditors, as well as those that are deemed to be constructively fraudulent, because they are made for less than reasonably equivalent value, when the debtor is, or is rendered, insolvent, undercapitalized, or unable to pay its debts as they become due." King et al., *Collier on Bankruptcy* ¶ 548.01 (15th rev. ed.1998); *see also Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254 (1st Cir.1991) ("The transfer of any interest in the property of a debtor, within one year of the filing of a petition in bankruptcy, is voidable by the trustee in bankruptcy if the purpose of the transfer was to prevent creditors from obtaining satisfaction of their claims against

---

16. *See* section IV.A.1 of this opinion.

the debtor by removing the property from their reach."). Section 548 of the Bankruptcy Code provides that a transfer of the debtor's interest in property may be avoided if the transfer was:

1. Made or incurred within one year prior to the filing of the bankruptcy petition; and

2. Was made with actual intent to hinder, delay, or defraud any creditor; or

3. The debtor received less than reasonably equivalent value and the transfer was made while the debtor was insolvent.

*See* 11 U.S.C. §§ 548(a)(1)(A) and (B); *Ferrari v. Bar–Land Corp. (In re Zenox),* 173 B.R. 46, 48 (Bankr.D.N.H.1994).

 For purposes of section 548, "a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee." 11 U.S.C. § 548(d)(1). The transfers of the Seneca and the Warrior were made when the bills of sale were recorded with the FAA in August and October 1996 and the alleged granting of the security interests were effective immediately before the filing of the petition as they were not properly recorded under state law. Accordingly, all of the transfers were made within one year of the Debtors' bankruptcy filing. As outlined in the Court's findings under Count I of the Emerson Complaint,[17] the Court finds that the Debtors did not transfer the Seneca or the Warrior with actual intent to hinder, delay, or defraud any creditors. *See Max Sugarman,* 926 F.2d at 1254 (indicating that fraudulent intent within the meaning of section 548(a)(1) is

frequently inferred from the circumstances surrounding the transfer taking particular note of certain recognized indicia or badges of fraud). Such transfers were made for the purpose of satisfying the Debtors' obligations to Stephenson and were made in an attempt to preserve their business and pay creditors. The Trustee cannot prevail under section 548(a)(1)(A).

The Trustee may still prevail under section 548 if he can establish that the transfers were constructively fraudulent. The Debtors were admittedly insolvent at the time of the transfers challenged by the Trustee in Count II of the Stephenson Complaint. Therefore, if the Trustee can establish that the Debtors received less than reasonably equivalent value ("REV") for any of the transfers, he will prevail under section 548(a)(1)(B) and the transfer may be avoided.

 The evidence on value was discussed above in the Court's findings on Count I of the Emerson Complaint[18] and Count I of the Stephenson Complaint.[19] The evidence did not establish that the Debtors' equitable interest in the Seneca (i.e. the value in excess of the amount paid to the Bank by William Stephenson) had any value. While the Debtors and Stephenson had a "loose" agreement concerning a credit if and when any value was recovered, the Debtors had not received any credit as of the time of trial. Accordingly, the Court finds that the Trustee has not met his burden of proof with respect to the Debtors receiving less than REV for the Seneca.

[53] Similarly, the evidence established that the Debtors owed Stephenson in excess of $40,937.00 at the time the Warrior was transferred to him and that the airplane was worth somewhere between $18,000.00 and $25,000.00. After the transfer

---

17. *See* sections III.A.1 and III.A.2 of this opinion.

18. *See* section III.A.1 for discussion of the value of the Seneca and section III.C for discussion of the value of the Warrior.

19. *See* section IV.A.3.a for discussion of the value of the Seneca.

of the Warrior, Stephenson credited the Debtors' $20,000.00 on their obligation under the Fifth Loan, which left a balance due of $20,937.00. The Court finds that the Debtors received REV for the Warrior. Accordingly, the Trustee has not met his burden of proof under section 548(a)(1)(B).

■ The evidence established that the Debtors received no monetary value for the alleged granting of security interests to the Stephensons. Accordingly, the Trustee has met his burden of proof that the alleged granting of these security interests to Stephenson and his son in September 1996 were constructively fraudulent. The security interests, to the extent they exist, may be avoided under section 548(a)(1)(B)(i) and (a)(1)(B)(ii)(I) of the Bankruptcy Code.

## C. Count III: Fraudulent Transfers under RSA 545–A

The Trustee alleges that the transfer of the Seneca, the transfer of the Warrior, and the alleged granting of security interests to the Stephensons were fraudulent and can be avoided pursuant to section 544(b) of the Bankruptcy Code and New Hampshire RSA 545–A, the UFTA. Stephenson and his son again argue that the Debtors transferred no interest in the Seneca and did not have fraudulent intent with respect to the transfer of the Warrior or the granting of the security interests.

The UFTA is similar to section 548 of the Bankruptcy Code. The UFTA defines transfers that are fraudulent as to present and future creditors as follows:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(1) Was engaged or was about to be engaged in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

RSA 545–A:4(I). The statute also lists eleven factors which may be considered in determining actual intent. See RSA 545–A:4(II). Those factors include whether the transfer was to an insider, whether the debtor retained control of the property transferred after the transfer, whether transfer was concealed, whether the debtor had been sued before the transfer, and whether the debtor was insolvent when the transfer was made. See id.

The UFTA defines transfers that are fraudulent as to present creditors as follows:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred:

(a) if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation; or

(b) if the transfer was made to an insider for an antecedent debt, the debtor was insolvent, and the insider had reasonable cause to believe that the debtor was insolvent.

*See* RSA 545–A:5(I) and (II). The definition of "insider" under the UFTA is substantively the same as the definition under the Bankruptcy Code. *See* RSA 545–A:1(VII); 11 U.S.C. § 101(31). Under the UFTA "transfer" means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes ... creation of a lien or other encumbrance." RSA 545–A:1(XII). For purposes of the UFTA, a transfer of personal property that is not a fixture is made "when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under [the UFTA] that is superior to the interest of the transferee." RSA 545–A:6(I)(b).

As outlined above in the Court's discussion of the Trustee's claim under section 547,[20] the Trustee has established that the Debtors made transfers to insiders on account of an antecedent debt at a time when the Debtors were insolvent. The fourth element under RSA 545–A:5(II), that the insider had reasonable cause to believe that the Debtors were insolvent, is not an element under either section 547 or section 548 of the Bankruptcy Code. Unlike the Trustee's claims under sections 547 and 548 of the Bankruptcy Code, the receipt of REV, or the lack thereof, by the Debtors is not an element of the Trustee's claim under RSA 545–A:5(II) when the transfer is to an insider. *See Comer v. Calim*, 128 Ohio App.3d 599, 716 N.E.2d 245, 249–50 (1998) (explaining that a conveyance may be set aside as constructively fraudulent under the UFTA, regardless of the motives of the principal actors, if (1) the creditor's claim arose before the transfer, (2) the transfer was made to an insider for an antecedent debt, (3) the debtor was insolvent at the time of the transfer, and (4) the insider had reasonable cause to believe that the debtor was insolvent); *Prairie Lakes Health Care Sys., Inc. v. Wookey*, 583 N.W.2d 405, 413

(S.D.1998) ("To void a transfer under this section the following elements must be established: (1) the creditor's claim arose before the transfer; (2) the transfer was made to an insider; (3) the transfer was made for an antecedent debt; (4) the debtor was insolvent at the time; and (5) the insider had reasonable cause to believe the debtor was insolvent."). *See also* Paul P. Daley and Mitchel Appelbaum, "The Modernization of Massachusetts Fraudulent Conveyance Law: The Adoption of the Uniform Fraudulent Transfer Act," 83 Mass. L.Rev. 337, 342–43 (1998) ("This section [of the UFTA] allows such creditors to challenge transfers to insiders, even if the debtor received reasonably equivalent value in exchange for its property and the creditor did not gain any unfair advantage (e.g., such as the repayment by the debtor of an insider loan).... In contrast to a bankruptcy preference, there is no requirement [under the UFTA] that the transfer enable the creditor to receive more than it would receive in a liquidation of the debtor's assets. This inconsistency may now allow bankruptcy trustees or debtors, standing in the shoes of specific creditors, to recover, under the strong arm power of the Bankruptcy Code, a transfer to an insider when such transfer would not be recoverable as a preference under the Bankruptcy Code since they may choose to apply applicable state law or the Bankruptcy Code.").

The evidence established that a judgment in the amount of $185,000.00 was entered against Emerson in April 1996 and that Stephenson had assisted Emerson as an advisor on aviation issues during the trial of that case. Further, the Stephensons sent the Debtors a demand letter in April 1996 and commenced their efforts to secure additional collateral for their existing loans. In September 1996, the Debtors and the Stephensons met to discuss how to protect the Stephensons' interests and to maintain the Debtors' business op-

20. *See* section IV.A.3 of this opinion.

erations in the face of growing pressure from the IRS and the senior mortgage holder. In view of the Debtors' dire financial and business predicaments during the course of 1996 and the level of cooperation between the Debtors and the Stephensons to protect the Stephensons' interests while preserving the Debtors' business and livelihood, the Court has little difficulty finding that Stephenson and his son had reasonable cause to believe that the Debtors were insolvent at the time of the transfer of the Seneca, the transfer of the Warrior, and the alleged granting of security interests to the Stephensons. Accordingly, the Court finds that these transfers may be avoided pursuant to RSA 545–A:5(II).[21] The Trustee may recover Emerson's interest in the Seneca from William Stephenson and the Warrior from Stephenson pursuant to sections 550(a) and (c) of the Bankruptcy Code. However the Trustee's interest in the Seneca is subject to William Stephenson's interest in the amount of $6,070.08 on account of the payment he made to the Bank because, as the Court discussed above, the Debtors' equitable interest in the airplane was limited to the value of the Seneca in excess of the payoff to the Bank.

## V. CONCLUSION

In summary, the Court finds:

A. Count I of the Emerson Complaint is denied. The Trustee did not satisfy his burden of proving under section 727(a)(2) that the Debtors transferred the Seneca and the Warrior and concealed the lease income from the Debtors' hangars and the "repossession" of their assets by the Stephensons, all with an intent to hinder, delay, and defraud their creditors and the Trustee.

B. Count II of the Emerson Complaint is denied. The Trustee did not satisfy his burden under section 727(a)(3) of establishing that the Debtors' records were inadequate for determining their financial affairs or business transactions.

C. Count III of the Emerson Complaint is granted in part and denied in part. The Trustee met his burden of proof under section 727(a)(4)(A) with respect to the Debtors' failure to disclose the transfer of the Warrior in response to questions in the statement of financial affairs and, accordingly, the Debtors are denied a discharge. The Trustee did not meet his burden of proof with respect to all other allegations under Count III.

D. Count IV of the Emerson Complaint is denied. The Trustee did not meet his burden of proof under section 727(a)(5) regarding the Debtors' alleged failure to explain the disposition of assets.

E. Count I of the Stephenson Complaint is granted in part and denied in part. The Trustee may avoid the transfer of the Warrior and the alleged granting of security interests in personal property to the Stephensons as preferential transfers under section 547(b) and may recover the Warrior pursuant to sections 550(a) and (c). The Trustee may not avoid the transfer of the Seneca pursuant to section 547(b).

F. Count II of the Stephenson Complaint is granted in part and denied in part. The Trustee may avoid the alleged granting of security interests to the Stephensons as fraudulent transfers under sections 548(a)(1)(B)(i) and (a)(1)(B)(ii)(I). The Trustee may not avoid the transfer of the Seneca nor the transfer of the Warrior pursuant to section 548.

G. Count III of the Stephenson Complaint is granted. The Trustee may avoid the transfer of the Seneca, the transfer of the Warrior, and the granting of the alleged security interests to the Stephensons as fraudulent pursuant to section 544(b) of the Bankruptcy Code and RSA 545–A:5(II), and he may recover the Seneca and the Warrior pursuant to sections 550(a) and (c) of the Bankruptcy Code.

21. The Court need not address the Trustee's claims under RSA 545–A:4 and 5(I).

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate judgment consistent with this opinion.